STATE, EX REL. PLATTE COUNTY, ET AL., RELATORS, V. GEORGE L. SHELDON ET AL., RESPONDENTS.

FILED JULY 12, 1907. No. 15,274.

Statutes: CONSTRUCTION. When a statute has for nearly 40 years been practically construed by the officers whose duty it is to enforce it, and has during that time been several times reenacted by the legislature in substantially the same terms, such construction will be regarded as adopted by the legislature, although the language of the statute would indicate a different meaning.

ORIGINAL application for a writ of mandamus to compel respondents, members of the state board of equalization and assessment, to certify to the county clerk of Platte county the valuation of the Union Pacific Railroad in Platte county, and that the assessed valuation is 20 per cent. thereof. _Writ denied._

_W. N. Hensley_ and _J. J. Sullivan,_ for relators.

_W. T. Thompson, W. B. Rose_ and _Grant G. Martin,_ contra.

SEDGWICK, C. J.

The county of Platte and the treasurer of said county have asked this court for a peremptory writ of mandamus

against the defendants as the state board of equalization and assessment to "certify and show in and by their return to the county clerk of Platte county that the true valuation of each and every mile of said railroad in said county is $75,000, and that the assessed valuation thereof is 20 per cent. of that amount."

The petition alleges, after the usual formal allegations, that, "heretofore, to wit, on the 1st day of June, 1907, the defendants, while convened and regularly in session as a state board of equalization and assessment, and having before it all information contemplated or required by law in relation to the value of said railroad (the road of the Union Pacific Railroad Company), including tangible property and franchises, did proceed to find, and did find and fix, the true value thereof at $75,000 a mile for each and every mile of said railroad in Nebraska, and did at the same time find and fix the assessed value of each and every mile of said railroad in Nebraska at 20 per cent. of the true or actual value thereof. The valuation of each mile of said road was by said board ascertained and determined by dividing the whole value thereof in this state by the number of miles of main track in this state, as required by section 89, art. I, ch. 77, Comp. St. 1905. The said county is, and for many years last past has been, under township organization. The county seat is the city of Columbus, a duly organized city of the second class having a population of between 4,000 and 5,000. About 20 miles of the main track of said railroad runs in a substantially easterly and westerly direction through said city and through the townships of Columbus and Butler in said county. Between 40 and 45 miles of the main track of said railroad runs in a substantially northerly and westerly direction from said city, through the townships of Columbus, Lost Creek, Monroe, Burrows and Granville, in said county. Although this road, running northerly and westerly from said city, is commonly known as the Omaha & Republican Valley Railroad, it is owned, controlled and operated by the Union Pacific Railroad

Company, and was by defendants, in ascertaining and determining the value thereof for the purpose of taxation, considered, treated and dealt with as a part of said company's mileage in Nebraska. Although defendants sitting and acting as a state board of equalization and assessment have, for the purpose of taxation, found and fixed the actual and true value of each and every mile of said railroad in said county at $75,000 a mile, and have fixed and assessed the value thereof per mile at 20 per cent. of the true value, they have determined, and they now threaten and intend, to make return to the county clerk of said county, to be used as the basis of levying taxes for county, township, city, village, school and road districts therein, showing an untrue, unjust and unlawful valuation of the said railroad property in said county. The said board threaten and intend, and, unless enjoined from so doing by the order of this court, will in the return to said county clerk, which it is required to make under sections 93 and 94 of said chapter and article of the Compiled Statutes, fail and refuse to show and certify that the average value per mile of said road in said county is $75,000, and that the assessed value of each mile thereof is $15,000, but will in and by such return show and certify that the average value per mile of the portion of said road running through said city and through the said townships of Columbus and Butler (being about 20 miles) is $110,000, or thereabouts, and that its assessed value is 20 per cent. of that amount, and that the average value per mile of the remainder of said road in said county (being 40 and 45 miles) is $42,000, or thereabouts, and that the assessed value thereof is 20 per cent. of that amount. If the said board is permitted to make its said return to the county clerk of said county as it now proposes, threatens and intends to make it, the assessed valuation of said railroad property apportioned to said county for the purpose of taxation will be about $776,000, instead of about $900,-000, which is the assessed valuation to which it is justly entitled upon an apportionment made according to law."

The answer admits the facts to be as alleged in the foregoing quotation from the petition. The defendants admit that in their distribution of the taxable values of this railroad property and certification to the county clerks of the several counties they intend to place greater value upon the main line of the road than they place upon the branch lines thereof. The plaintiffs insist that they have no right to do this under the statute; that the valuation of the whole mileage of the road, including the main line and branch lines, have been ascertained to be $75,000 a mile, and must be so certified to the various county clerks. The answer alleges: "Ever since railroad property has been taxed in the state of Nebraska, it has been, and now is, a custom, under a statutory provision still in force, of the state board, having authority to estimate the value of and tax railroad property, to distribute or apportion the values to be used as the basis of levying taxes for county, township, city, village, school and road district purposes, according to their best judgment of the value of each of the main lines or of the branch or other lines of each railway system. It is the purpose of respondents to follow this custom; and, while no formal order of distribution or of apportionment has been made by the state board of equalization and assessment for the year 1907, the following tentative distribution as to taxable values for the Union Pacific has been considered by respondents: Main line 467.38 miles, at $21,500 per mile; Omaha & Republican Valley, 428.30 miles, at $9,200 per mile; Kearney branch 65.74 miles, at $6,575.45 per mile. Respondents aver that this custom is authorized by law, and is by reenactment of the old law the proper construction of the existing statutes. Respondents deny that the railroad property apportioned to Platte county for the purpose of taxation should be about $900,000."

The contention of the relators is that the board is required by statute to distribute the total valuation of this railroad property in the state to each county in proportion to the mileage of the road in such county, in-

cluding both the main line and branch lines; that is, having found that the valuation of the total property of the railroad company in the state is equal to $75,000 a mile of both its main and branch lines, the board must distribute it upon that basis for taxation to each county, $75,000 valuation for each mile of main and branch lines situated in that county. The board contends that it is within the discretion of the board to distribute a larger ratio of valuation per mile for the main line and a less valuation for branch lines. The case was considered urgent, and the defendant has not furnished us with a brief, but in the oral argument the attorney general contended that the statutes bearing upon the point in controversy were first enacted in 1869, and have ever since that time been construed as the defendants now propose to construe them, and that under these statutes the distribution of values for taxation has always been made in the manner the defendants now propose to make it; that the revenue laws of the state have been revised and altered at various times while this custom has existed, and during that time these provisions of the statute have been many times reenacted, but always in substance and effect the same as they existed in the act of 1869. These contentions on the part of the defendants were not controverted by the relators, but it was vigorously contended that the existence of such custom and practice for this long term of years did not give it the sanction of law. It was conceded that if the statute was of doubtful meaning, and if it was capable of being construed to sanction the method of distribution that had been pursued, the practical construction given it by the executive branch of the state government ought to control; but it was maintained that the construction contended for by relators was so plain and unequivocal that no practice in violation of the law could ever justify a disregard of the plain statutory provisions.

The solution of the question thus presented depends upon the construction to be given to sections 87, 89, 90

and 93 of the revenue act (Comp. St. 1905, ch. 77. art. I). The parts of the statute above cited bearing most directly and literally upon the points in question are the seventh subdivision of section 87 and the last sentence of section 89, which are as follows:

"A correct return of the value of all tools and materials used for repairs, and of all other personal property in the state of Nebraska, together with such other information as the state board of equalization and assessment may require in order to enable them to apportion such rolling stock between the main line and branches of said road."

"The valuation of each mile to be determined by dividing the whole value by the number of miles of the main track of each road or line."

The former assumes that the board will "apportion such rolling stock between the main line and branches of said road." The relators suggested that the section in which this language occurs relates to all persons, companies or corporations owning, operating or controlling any railroad or railroad service, as well as to railroad companies themselves, and that it is the rolling stock alone that it is assumed will be apportioned between "the main line and branches"; that this rolling stock is to be apportioned only to those lines and branches over which it is used, and that therefore subdivision 7 does not assume that the total valuation of the road is to be apportioned among the main lines and branches. This reasoning upon this point is very convincing, and it would seem that the construction so contended for was the one most natural to be derived from the language used; but it does not account for the use of the word "between" instead of the word "among," and the use of the word "between" may be thought to indicate that it was contemplated that the apportionment to the main line, upon the one hand, and the branches, upon the other, would be the principal feature of this part of the board's duties.

Again, although it may be thought that the natural

construction of the language of the last part of section 89 above quoted is as contended by the relators, still there is some reason for the contention that this language is susceptible of a different meaning. The words "main track" in this section are clearly used to distinguish from "side or second track and turn out, spur and warehouse track," and not to distinguish the main line from the branch line, as plainly appears from the first part of section 87 and from other sections of the act. The construction that has been placed upon the language now under consideration by the state board is that the number of miles of the main track of each road or branch line is to be taken as the divisor in finding the value per mile of such road or branch line, as the case may be, and that the thing to be divided by this divisor is the whole value of the road or branch line, as the case may be, when that value has been ascertained and apportioned by the board, that is, the board finds the whole value of the road and then determines what part of that whole value should be apportioned to the main line and what part to the branch lines respectively, and then divides the whole value apportioned to the main line by the number of miles of that line, and the whole value apportioned to each of the branch lines by the number of miles of each of the branch lines respectively. It must be confessed that such a construction of the statute is forced and unnatural, but it may perhaps with reason be contended that it is not an impossible construction. There is, of course, no doubt of the power of the legislature to have provided such a method of apportionment, and it must be remembered that the contemporaneous construction contended for is not the construction given it by the state board alone, but it is the practical construction given it by the legislature itself. Even in the construction of constitutional provisions some courts have held that the practical construction adopted and long continued by the legislative department will be followed, even when clearly erroneous. 8 Cyc. 737. This court has not generally adopted this

doctrine. It was said in *State v. Cornell*, 60 Neb. 276:
"While a practical interpretation of the constitution by
the legislature will not be lightly disregarded in doubtful
cases, yet, when the language of the constitution is free
from ambiguity, an interpretation thereof by the legisla-
tive department cannot be invoked to nullify the funda-
mental law." In a very recent case, the supreme court
of Illinois has held that a practical construction by the
executive department of an act of the legislature through
a period of nearly 40 years will not be followed by the
courts when such construction is clearly contrary to
the intention of the legislature in enacting the law.
*Whittemore v. People*, 227 Ill. 453, 477, 81 N. E. 427.
From this proposition Mr. Justice Carter dissented. In
his dissenting opinion he said: "All the facts and cir-
cumstances indicate that the construction placed upon
this statute during 40 years by those charged with its
enforcement has been in good faith, with the full belief
that not only the letter but the spirit of the law was
being observed. In some jurisdictions long continued,
contemporaneous and practical construction by the legis-
lative and executive departments has been followed, even
though the courts believed the language under consider-
ation clear and unambiguous. 8 Cyc. 737; 26 Am. & Eng.
Ency. Law (2d ed.), 634. This court has stated that
such construction will govern only where the language
of the statute is doubtful, yet an examination of the
decisions in this state will disclose that in almost every
instance such contemporaneous, uniform and long-con-
tinued construction by public officials in the execution of
the law has been followed by this court." In the case at
bar the argument of contemporaneous construction is
much stronger than it is in cases where it is attempted
to apply it to the construction of constitutional provisions,
or where the construction of statutes by executive officers
is relied upon. If a constitutional provision which had
been practically construed for a period of 40 years was
adopted anew in a revision of the constitution without

change of the phraseology, the presumption that in re-adopting the phraseology the people approved of the con-struction that had been placed upon it would be strong, and would be analogous to the position in the case which we have at bar. The respective legislatures which have reenacted the provisions of the statutes from time to time must be presumed to know of the practical construction which was being put upon the statute, and by reenacting it without change the presumption arises that the con-struction so placed upon it met with the legislative ap-proval. Under such circumstances, it seems to us that if the practice is to be changed it ought to rest with the legislature, and not with the courts, to inaugurate the change. The house of representatives of the last legislature adopted a resolution condemning the practice. The fact that the views of the house upon this subject were not concurred in by the senate nor approved by the governor gives emphasis to the conclusion that the change in the statute, if any is desired, ought to await the action of the legislature.

From these considerations, it follows that the peremp-tory writ of mandamus must be denied.

WRIT DENIED.