## STATE BOARD OF LAND COM'RS et al. v. RIRIE, State Auditor.

No. 3463.   Decided April 29, 1920.   (190 Pac. 59.)

1.  STATES—AUDITOR MAY OBJECT TO USE OF MONEY FOR PURPOSES
    FOR WHICH NOT APPROPRIATED.  Under Comp. Laws 1917, section
    5715, subd. 16, requiring the Auditor to draw warrants on the
    State Treasurer for the payment of moneys directed by law to
    be paid out of the treasury, but providing that no warrant
    must be drawn unless authorized by law, when money is appro-
    priated for a particular purpose, and it is attempted to be used
    for a different purpose, it is the Auditor's privilege and duty to
    object and refuse to draw a warrant.

2.  STATES—AUDITOR CANNOT INQUIRE INTO DESIRABILITY OF INVEST-
    MENT BY LAND BOARD.  If the investment of the funds of the
    State Land Board in town bonds is authorized by law, the
    Auditor on requisition from the board for a warrant, has no
    power to ascertain whether the investment is desirable or the
    security sufficient, or investigate any of the preliminary steps
    leading up to the action of the Land Board in deciding to make
    the investment.

3.  MANDAMUS—PRESUMPTION INDULGED THAT LAND BOARD HAS SAT-
    ISFIED ITSELF AS TO DESIRABILITY OF INVESTMENT.  In a manda-
    mus proceeding by the State Land Board to compel the Auditor
    to issue his warrant for an amount which the board desires
    to invest in town bonds, the presumption may be indulged, in
    the absence of any showing to the contrary, that the board
    has satisfied itself as to the desirability of the investment, the
    sufficiency of the security, and the legality of the bonds.

4.  STATES—FUNDS OF STATE LAND BOARD MAY BE INVESTED IN
    TOWN BONDS; "CITY."  Under Comp. Laws 1917, section 5607,
    authorizing the State Land Board to invest its funds in govern-
    ment, state, county, city, or school district bonds, it may invest
    funds in town bonds, in view of section 5848, providing that,
    in the construction of statutes, "city" may mean incorporated
    town, and also in view of the custom of the Land Board for
    more than fourteen years to make such investments.[1]

5.  STATUTES—WORDS CONSIDERED IN RELATIONSHIP TO CONTEXT AND
    GENERAL PURPOSE.  To determine the intent of the Legislature,

---

[1] *Mutart* v. *Pratt*, 51 Utah 246, 170 Pac. 67.

the words used by it must be considered in their relationship to the context and the general purpose or intent of the act in which such words are found.

6. EVIDENCE—JUDICIAL NOTICE TAKEN OF ACTS OF AUDITOR AND STATE LAND BOARD. Under Comp. Laws 1917, section 7076, the court will take judicial notice of the acts and proceedings of the Auditor and State Land Board, as they are parts of the executive department of the state.

7. STATUTES—LEGISLATURE PRESUMED TO KNOW CONSTRUCTION BY STATE OFFICERS. The Legislature is presumed to know the construction placed upon a statute by state officers acting under it.

8. STATUTES—EXECUTIVE CONSTRUCTION, THOUGH NOT BINDING, ENTITLED TO CONSIDERATION. While the construction of a statute by the executive department is not binding upon the courts, it is entitled to serious consideration, unless it does violence to the apparent intent of the language used, especially if the statute has been in force for any great length of time and has been so construed.

FRICK, J., dissenting in part.

Original mandamus proceedings by the State Board of Land Commissioners and its members against Joseph Ririe, State Auditor.

PEREMPTORY WRIT ISSUED.

*Dan B. Shields*, Atty. Gen., *Jas. H. Wolfe, O. C. Dalby* and *H. Van Dam, Jr.*, Asst. Attys. Gen., for plaintiffs.

*M. E. Wilson*, of Salt Lake City, for defendant.

GIDEON, J.

This is an original proceeding in this court. By it the State Land Board, and the individual members thereof, as plaintiffs, seek, by mandamus, to compel the defendant State Auditor to issue a warrant upon the Treasurer of the state in favor of the State Land Board in the sum of $20,000, to

be used as a first payment on an investment of $110,000 in bonds of the town of Orem, located in Utah county.

The board, at a regular meeting, had determined to make such investment from the funds under its control. On February 25, 1920, the board drew its notice and requisition directed to the Auditor, requesting him to issue his warrant on the State Treasurer for the said sum of $20,000. The Auditor refused to recognize the request and issue the warrant as directed; hence this proceeding.

The defendant demurred to the petition on the ground that it does not state facts sufficient to entitle plaintiff to the relief sought. On that state of the record the matter has been argued and submitted to this court for decision.

Lengthy arguments are submitted, both on the part of the Attorney General for plaintiffs and by counsel for defendant, respecting the duties of the State Auditor. The petitioners contend that it is no part of his duty to inquire into the purpose or object for which the state funds are to be invested; that the Land Board having decided that it is to the best interests of the state to make the investment and having issued the requisition, and the Auditor having satisfied himself that there is sufficient money in the particular fund upon which the warrant is ordered drawn to pay such warrant, and finding that the board is a legally constituted agency with authority to make the requisition, it then becomes his duty, and his only duty, to issue the warrant in accordance with the notice and requisition. On the other hand, it is the contention of defendant that it is his duty to inquire into the authority of the board to make the particular investment and that if such investment is not authorized by law it then becomes his duty to decline to issue the warrant, and that this court will not, by mandamus or other order, coerce or compel him to comply with the notice and requisition.

Comp. Laws Utah, section 5715, defines the duties of the State Auditor. Subdivision 16 thereof reads as follows:

"To draw warrants on the State Treasurer for the payment of moneys directed by law to be paid out of the treasury; but no

warrant must be drawn unless authorized by law. Every warrant must be drawn upon the fund out of which it is payable and specify the appropriation applicable to the payment thereof."

As we view this record, it is neither necessary nor desirable to enter into a lengthy discussion respecting the general duties imposed by law upon the Auditor. It may, however, be said, as a general proposition, which we think is within the authorities and supported by reason, that when money is appropriated for a particular purpose, and it is attempted to be used for a different purpose, then it is not only the Auditor's privilege, but it his duty as well, to interpose an objection to such application of the funds. That **1, 2** would be the duty of any officer having to do with the funds of the state. He would, in fact, be derelict in his duty if he failed so to do. However, it is no concern of the Auditor, neither is it a part of his duty, to ascertain whether the investment is desirable or whether the security is sufficient. Whenever the Land Board, or any committee or official whose duty it is to determine those matters, has acted, such acts or conclusions are final and binding upon the Auditor, so long as the investment is authorized by law. If, therefore, the Land Board in this case has attempted to invest or pay out the funds intrusted to it for any purpose not authorized by law, then, clearly, the Auditor would be within his legal rights and duties in declining to move.

In *State* v. *Tarpen*, 43 Ohio St. at page 321, 1 N. E. at page 215, it is said:

"If his [the auditor's] duty is clear, its performance will not be excused by his doubts concerning it, however strong or honest they may be. It is not doubted that it is competent for an auditor to defend against an application for mandamus to compel him to issue his warrant on the treasurer, upon an allowance and order of the commissioners, by showing that the order was wholly unauthorized, and that the commissioners had no authority to make it. *State* v. *Yeatman*, 22 Ohio St. 546. It is enough to say that in the present case no fact is shown which impeaches the original order of the commissioners, or excuses the auditor from obeying its command. His duty to draw his warrant in favor of the relator is clear. That mandamus is the proper remedy to compel the performance of that duty is abundantly established by authority."

The Land Board in this case has acted.   It has decided to invest certain of the state's money intrusted to it for invest- ment in the bonds of the town of Orem.   This court has the right to indulge the presumption, in the absence of any show- ing to the contrary, that the board has satisfied itself as to the desirability of the investment and the sufficiency of the security as well as the legality of the bonds.   If the Land Board is authorized under the statutes to invest the state funds in the bonds of a town, then it is no part of the Au- ditor's duty to question the wisdom of that invest- ment.   Neither is he required, nor is it his duty, to in- vestigate any of the preliminary steps leading up to the action of the Land Board in deciding to make the in- vestment.   The law has granted to, and imposed upon, the Land Board both that power and responsibility.   In the very nature of things, in carrying on the affairs of the state, it could not be otherwise.   If the Auditor were charged with the duty and responsibility of examining and determining the regularity and desirability of the investment of the funds of the state, then, indeed, would conflicts, disputes, and gen- eral chaos follow.   The law has vested no such duty or au- thority in the Auditor.   It therefore only remains for this court to determine whether the Land Board has authority, under the statute creating it and defining its duties to invest the funds under its control in the purchase of town bonds. That is the precise question here presented and the one upon which, as we are advised, the judgment of this court is de- sired.

The act which is known as chapter 1, tit. 101, Comp. Laws Utah 1917, gives to the State Land Board the direction, management, and control of all lands which have heretofore been, or which may hereafter be, granted to the state by the United States government or otherwise, with power to sell or lease the same for the best interests of the state and in accordance with the provisions of said chapter and the Con- stitution of the state.   It is also made the duty of the State Land Board to invest the funds arising from the sale and lease of such lands "in the manner provided in this chap-

ter." In section 5607 (which is a part of said chapter and title) it is provided:

"The board shall make the necessary orders for the investment or disposal of the funds derived from the sale and rental of public lands of the state, in the state treasury. Such funds shall be invested for and on account of the specific purposes for which the lands were granted, in government, state, county, city, or school district bonds. * * * Whenever the board shall order the investment of any part of such funds, said board shall notify the State Auditor of such order and the State Auditor shall draw a warrant for the amount stated in the notice in favor of the State Board of Land Commissioners, and the State Treasurer shall pay such warrant out of the funds designated. * * * "

Defendant contends that, under the provisions of the foregoing statute, the State Land Board is without authority to invest the state school funds in bonds of incorporated towns; that the act has undertaken to and does enumerate the political subdivisions whose bonds may be purchased by the board; that the mention or enumeration of certain municipalities or legal subdivisions of the state negatives the intent to authorize the investment in bonds of any other or additional political subdivisions. It is further contended that by the general statutes of the state cities and towns have different powers and are organized under different provisions of law; that their powers are not similar; and that the authority and powers delegated to trustees of towns are much more limited than those delegated to the governing bodies of cities. Therefore it is insisted that the Legislature, recognizing this difference, intentionally omitted the word towns from the statute enumerating the municipalities in the bonds of which the funds of the state may be invested.

It is the contention of the plaintiffs that Comp. Laws Utah 1917, section 5848, constitutes the rule of construction to be applied to section 5607, supra. Section 5848, so far as material here provides: 4

"In the consrtuction of the statutes the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the Legislature or repugnant to the context of the statute: * * * (21) The word 'town' may mean incorporated

town and may include cities, and the word 'city' may mean incorporated town."

In 36 Cyc. 1105, it is said:

"It is competent for the Legislature to enact rules for the construction of statutes, present or future, and when it has done so each succeeding Legislature, unless a contrary intention is plainly manifested, is supposed to employ words and frame enactments with reference to such rules."

It is a well-recognized rule of construction that, in order to determine the intent of the Legislature, the words used must be considered in their relationship to the context and the general purpose or intent of the act in which such words are found.

The evident intent of the particular section under consideration was to direct or provide for the investment of the funds in the custody of the Land Board in securities usually considered safe, and such as would in due course be redeemed, both principal and interest. It is therefore pertinent to inquire what elements of security, if any, a city bond has over that of a town bond. In every case the final answer to such inquiry must depend (a) upon the prior indebtedness of such city or town; (b) the value of the taxable property in such city or town. The ascertainment of these facts are questions that must, in the present case, be left to the determination of the Land Board. Authority is granted towns to issue bonds for certain specific municipal purposes, and we, as before indicated, assume that the bonds of the town of Orem have been regularly authorized and are legally issued. Such being the case, the town trustees have the same power and authority to levy taxes for the redemption of such bonds as have city officials. That the powers of the governing bodies of cities and towns may differ in other respects ought not to be of much influence in the determination of the question here involved.

The act in question was first adopted in 1897 (Laws 1897, chapter 37), and the provision above quoted was substantially the same in the original enactment as in the present law. It was carried forward into the revision of 1898 (Rev.

St. 1898, section 2357), then into the compilation of 1907 (Comp. Laws 1907, section 2357. The Legislature amended said section 5607 in 1911 (Laws 1911, chapter 71), and again in 1915 (Laws 1915, chapter 37). As amended it was carried into the Compiled Laws of 1917. It was again re-enacted and amended in 1919 (Laws 1919, chapter 109). The particular part of the statute authorizing the investment of the funds in the custody of the Land Board "in government, state, county, city or school district bonds" has remained the same from the original enactment through all revisions, compilations, and amendments down to the present law.

It has been the custom of the Land Board for more than fourteen years to invest funds in its custody in town bonds within this state. Such is a matter of public record, both in the Auditor's office and in the office of the State Land Board. The Auditor and the State Land Board are **6** parts and parcels of the executive department of the state. This court, therefore, is authorized to and will take judicial notice of the acts and proceedings of the two offices. Comp. Laws Utah 1917, section 7076.

The Legislature is presumed to know the construction placed upon the language of the act by both the Land Board and the State Auditor. Notwithstanding that fact, the Legislature has met biennially, and there have been three revisions or compilations of the statutes since the original enactment. Furthermore, the particular section has been amended by the Legislature in 1911, 1915, and 1919. At no time, apparently, has the Legislature been dissatisfied with the interpretation of the Land Board and the State Auditor, but has given its affirmative approval by the re-enactment of the section with full knowledge of the **7, 8** interpretation placed upon it. While it is true that the construction of a statute by the executive department is not binding upon the courts, it is, nevertheless, also true, and is so determined by the overwhelming weight of authority, that unless such construction does violence to the apparent intent of the language used it is entitled to serious consideration by the courts, and especially so if the statute

has been in force for any great length of time and has been so construed. The general rule under such facts may be found stated in Black, Int. Laws (2d Ed.) section 94. There the author says:

"The executive and administrative officers of the government are bound to give effect to the laws which regulate their duties and define the sphere of their activities, and in so doing they must necessarily put their own construction upon such acts. * * * Now, such practical constructions are never binding upon the courts. * * * But it is a rule, announced by the Supreme Court of the United States at an early day, and which has since been followed in numerous cases, both in the federal and state courts, that the contemporaneous construction put upon a statute by the officers who have been called upon to carry it into effect, made the basis of their constant and uniform practice for a long period of time, and generally acquiesced in, and not questioned by any suit brought, or any public or private action instituted, to test and settle the construction in the courts, is entitled to great respect; and if the statute is doubtful or ambiguous, such practical construction ought to be accepted as in accordance with the true meaning of the law, unless there are very cogent and persuasive reasons for departing from it."

In *Bloxham* v. *Consumers' Elec. L. & St. R. Co.*, 36 Fla. at page 540, 18 South. at page 446, 29 L. R. A. at page 509, 51 Am. St. Rep. at page 47, the court says:

"Besides the judicial construction of statutes, there is known to the law another kind of construction. This kind of construction has especial application to statutes made for the regulation of the different departments of the government, and is the interpretation put upon them by the actual administration of them by such departments. As distinguished from judicial construction, it is called the practical construction of statutes. While not of such high authority as a judicial interpretation of the act, such practical construction of the class of statutes referred to, when not in conflict with the Constitution or the plain intent of the act, is of great persuasive force and efficacy."

The second headnote to *City of Louisville* v. *Louisville School Board*, 84 S. W. 729 (119 Ky. 574), which correctly reflects the decision, reads as follows:

"The contemporaneous construction of legislation, covering a long period of time, by those charged with its enforcement, is highly persuasive of the correctness of that interpretation, especially

where the Legislature readopts the act without change after the construction has been given."

The syllabus to *State* v. *Sheldon,* 79 Neb. 455, 113 N. W. 208, reads as follows.

"When a statute has for nearly forty years been practically construed by the officers whose duty it is to enforce it, and has during that time been several times re-enacted by the Legislature in substantially the same terms, such construction will be regarded as adopted by the Legislature, although the language of the statute would indicate a different meaning."

The second headnote to *Van Veen* v. *Graham County,* 108 Pac. 252 (13 Ariz. 167), reads as follows:

"Where the Legislature re-enacts a statute after uniform construction by the officers required to act under it, the presumption is that the Legislature knew of such construction, and adopted it in re-enacting the statute."

We are of the opinion that by reason of the interpretation of this law by the executive department and its implied adoption by the Legislature, the provision of the statute that the word "city" may include incorporated towns, and it not appearing that such interpretation is inconsistent with the manifest intent of the Legislature or repugnant to the context of the statute, that this court ought not, under all the surrounding facts, adopt a construction contrary to that given the statute by the executive department. No, "very cogent and persuasive reasons for departing from" such construction have been suggested. These conclusions are supported by the opinion of this court in *Mutart* v. *Pratt,* 51 Utah 246, 170 Pac. 67.

Moreover, and aside from the rule of construction stated in our statute, it is held by the great weight of authority that "cities include towns." 11 C. J. 790. See, also, note "City as Including Towns and Villages," Ann. Cas. 1914B, 215.

The alternative writ of mandate heretofore issued is vacated and a peremptory writ is ordered issued.

CORFMAN, C. J., and WEBER, J., concur.

THURMAN, J. I concur in the opinion of Mr. Justice

GIDEON. There is but one question in this case, may the word "city" in section 5607, Comp. Laws 1917, mean "incorporated town"?

I have read with interest the dissenting views of my Associate, Mr. Justice FRICK. The question is one upon which reasonable minds may differ. The fact that my Associate disagrees is a demonstration.

In the interpretation of statutes, unless technical terms are used, we should give to the words employed their plain ordinary meaning. We should not resort to technical rules of construction unless the meaning is obscure. My views upon questions of this kind are amplified in *State* v. *Davis,* 55 Utah 54, 184 Pac. 161, and need not be repeated here. There is no necessity for resorting to technical rules or judicial determinations. The statutes themselves furnish us an unfailing guide.

Comp. Laws Utah 1917, section 5848, in part reads:

"In the construction of the statutes, the following rules shall be observed, *unless such construction would be inconsistent with the manifest intent of the Legislature.*"

Subdivision 21 of said section is as follows:

"The word 'town' may mean incorporated town and may include cities, and the word 'city' *may mean incorporated town.*" (Italics mine.)

It is insisted that this statute is not *in pari materia* with section 5607. Even if such contention be true, it nevertheless stands as an unimpeachable fact that the statute is a positive rule of construction enacted as such by the Legislature, and must be given full force and effect. 36 Cyc. 1105, and cases cited. No statute or series of statutes *in pari materia* could by any possibility be more potent in determining the meaning of a word or words used in a statute than is an act of the Legislature itself enacted for that especial purpose.

The statute says the word "city," when used in the statutes of the state, may mean incorporated town, and, unless such construction in the particular case would be contrary

to the manifest intent of the Legislature, I see no reason why such construction should not be given. The Legislature of the state, acting within constitutional limits, is the highest authority in this jurisdiction. There is no pretense that the statute is unconstitutional. Rules of construction adopted by the Legislature are entitled to serious consideration in arriving at the intent and meaning of the statutes. In a recent case before this court we found it necessary to resort to a statutory rule of construction, and were thereby enabled to satisfactorily solve a difficult legal question that would otherwise have given us serious trouble. *Industrial Com.* v. *Agee, Dist. Judge*, 56 Utah 63, 189 Pac. 414.

Whether or not construing the word "city" in the present case to also mean incorporated "town" is inconsistent with the manifest intent of the Legislature is the only question that remains to be considered. As to that question the statute itself imposes the burden upon those who take the negative view.

I have carefully read and considered the able briefs of defendant's counsel, and the masterly presentation by my Associate, Mr. Justice FRICK, in which every possible argument that can be made has been advanced in favor of the negative, and still I am unconvinced. Without intending to arrogate to myself the functions of either a critic or a censor, I am strongly impressed with the view that the elaborate discussion indulged in, in the briefs and opinion referred to, tends to confuse rather than to enlighten. There is no necessity of going outside of the statute itself. The question is, is the construction contended for by plaintiff inconsistent with the manifest intention of the Legislature? It is not contended that the town of Orem is without power to contract a bonded indebtedness. It is not shown that the security is hazardous, doubtful, or precarious. With all that has been said it is not made to appear that a loan to an incorporated town to the extent of its ability to pay is not as safe an investment as would be a loan under similar circumstances to an incorporated city. Much has been said as to the vast powers of an incorporated city as compared with the limited

powers of an incorporated town.　All this is aside from the question we are here to consider.　The material bearing of such facts on the question before us is not made to appear.　The bonds of a city, with its extensive powers, after all may be a poor security for a loan, while the bonds of an incorporated town may be gilt-edged.　It all depends upon the financial ability of the city or town in the particular case to pay its obligations.　The extent of their municipal powers, except as relates to their power to raise money to pay their debts, has nothing to do with the question under review.　I find nothing in the nature of an incorporated town as defined by the statutes of the state which militates against its financial ability.　The financial ability of either a city or an incorporated town, in the last analysis, depends upon the quantity and value of the taxable property within its municipal boundaries and its authority to levy a tax.　As far as the power to raise money by bonding is concerned, both the power and the *modus operandi* are the same in incorporated towns as they are in cities.　Comp. Laws 1917, sections 792, 793, and 794.

Examining the case from every possible angle, I am unable to perceive any reason why it should be presumed that the construction contended for by plaintiff is inconsistent with the manifest intent of the Legislature.　I see no reason, viewing the case from the standpoint of legislative intent, why the Legislature should have intended to exclude incorporated towns from the operation of section 5607.　The fact that incorporated towns are not expressly mentioned in section 5607 is the main pillar of strength of those who are opposed to the views herein expressed.　Such contention would have been conclusive prior to the legislative session of 1907, for previous to that time the word "city" did not, in any case, mean incorporated town.　As the law stood prior to 1907, the statute read: "The word 'town' may mean incorporated town and may include cities."　Revised Statutes 1898, section 2498, subd. 21.　Under that statute the word "town" might mean a city, but the word "city" might not mean an incorporated town.　In 1907 the Legislature, evidently noting

the discrepancy, amended the statute of 1898, subd. 21, to read as follows: "The word 'town' may mean incorporated town and may include cities, and the word 'city' may mean incorporated town." Sess. Laws 1907, page 79. Such is the law at the present time. In this amendment no exception is made of section 5607 or any other section of the statutes. Thereafter, unless such construction in a given case would be inconsistent, with the manifest intent of the Legislature, the word "city" might mean incorporated town.

I have endeavored conscientiously to find some logical reason why the statutory rule of construction as regards the word "city" should not be applied in the case at bar. The sole purpose, apparently, the Legislature had in view in 1907, in the amendment referred to, was to make the word "city" mean incorporated town whenever such construction would not be inconsistent with the legislative intent. The amendment had the effect of curing a condition for which no logical reason could be given as cities and towns are known and understood among the people of the state. The Legislature in enacting section 5607, in relation to the loaning of money, evidently had a twofold purpose in view: (1) The stability of the security upon which the money was loaned; (2) to accommodate our municipalities, and thereby assist in building up the commonwealth. The money thus loaned would be like "bread cast upon the water to be gathered after many days," whether the money was loaned to a county, city, school, or incorporated town. In view of all these considerations, what grounds are there for the assumption that the loan of money, arising from the sale or rental of state lands, to incorporated towns is inconsistent with the manifest intent of the Legislature? I think there are none. I do not care to discuss the question of practical construction. If the Land Board has adopted the practice of lending money to incorporated towns since the amendment of 1907, then there is some logical connection between the custom adopted and the law itself. In any event, I rest my opinion upon the meaning and intent of the statutes referred to as applied to this particular case.

Prayer for Mandamus.   Writ issued

I am of the opinion the writ should issue as prayed for in the complaint.

FRICK, J. (dissenting). I concur in the conclusion of Mr. Justice GIDEON that the defendant, as the Auditor of this state, may and ought to refuse to draw his warrant for any purpose for which no legal appropriation has been made, or for any purpose which is not authorized by law. I also concur in the conclusion that if an appropriation has been made for the purpose for which a warrant is demanded, or if the expenditure is authorized by law, then he may not legally refuse to issue his warrant for the reason that in his judgment the expenditure or investment, as the case may be, is unwise, unsafe, or otherwise. I am unable to concur in the conclusion however, that the investment sought to be made in this case, and for which plaintiffs ask this court for a writ of mandate to coerce the defendant to issue a warrant, is "authorized by law." In my judgment it is not authorized by law, and hence it is not only the privilege but it is the duty, of the defendant, as Auditor of this state, to refuse to issue his warrant against the school land fund.

I regret that my convictions compel me to take this position, and that hence I cannot concur with my Associates. I fully appreciate that dissenting opinions are not only stillborn, but, in most instances, useless; and that they detract from the weight of the decisions. Further, that it is the duty of every member of this court, where such a course is possible, to reconcile his views with those of his associates and submit to their judgment. I am, however, not able to do so in this case. In my judgment the prevailing opinion disregards the rules of construction, which, if heeded, would necessarily lead to an opposite conclusion. That fact standing alone, however, would not be sufficient in this case to induce me to separately state my views in a dissenting opinion. Laying aside all other considerations, and considering this case alone, it is not of much consequence whether the decision is one way or the other. The decision, however, is much more than of ordinary importance, since it may affect

hundreds of other cases in which the principles of interpretation and the rules of construction are involved.

There never was a time in the history of jurisprudence when it was more important than at the present time that the courts adhere religiously to the well-recognized and well-established rules of interpretation and construction, and thus declare the law as it is written by the lawmaking power. There never was a time in the history of the world when as many statutes were enacted as at the present time, nor upon a greater variety of subjects. These statutes, in very numerous instances, are so written as to require careful consideration and construction, not only for the purpose of determining the intention and meaning of the lawmakers, but for the purpose of harmonizing the various conflicting enactments which relate to the same or cognate subjects. Moreover, it is a well-known fact that those very numerous statutes are constantly submitted to the opinions of lawyers by their clients for the purpose of having the meaning and effect thereof determined as guides for their conduct in the most important as well as the most varied affairs of life. These lawyers are familiar with the rules of interpretation and construction which have been evolved by the experience and wisdom of thousands of judges sitting as courts during a period covering centuries for the purpose of ascertaining the actual intention and meaning of the lawmakers, and to the end that that intention may be declared and enforced. The lawyers, therefore, ascertain the meaning and intention of the lawmakers by the aid afforded by those rules, and advise their clients accordingly. It is safe to assert that at least ninety per cent. of the legal business transacted in law offices does not reach the courts, and that these lawyers implicitly rely upon the decisions of the courts in determining and applying the law in accordance with the rules of construction. It is of the highest importance, therefore, that the courts strictly adhere to those rules in rendering their decisions. To depart from them is to destroy both the stability and the certainty of the law, and might not infrequently leave both the lawyer and the client stranded upon a desert, in a state

of fear and doubt, without guide or bearing.

Before preceeding to a statement of the rules of construc-
tion that are applicable here, it becomes necessary to refer
to the statute in question, which is found in Comp. Laws
Utah 1917, section 5607, as amended by Laws Utah 1919,
page 308, chapter 109.   So far as material here, that section
provides:

"The board shall make the necessary orders for the investment
or disposal of the funds derived from the sale of public lands of
this state, in the state treasury. *Such funds shall be invested for
and on account of the specific purposes for which the lands were
granted, in government, state, county, city, or school district bonds*,
or in scrip or warrants issued against the funds to be raised by
special or local taxes or assessment under the provisions of the laws
of the State of Utah, or notes of the state made under the pro-
visions of sections 3806-3807, or in warrants on the reservoir land
grant fund issued under the provisions of section 5664; or in mort-
gages on improved farm lands ·within the state, or otherwise as
provided by law.  *  *  *"

The italicized words are the only ones that are of compel-
ling force here.

The act in which section 5607, supra, was included was
first adopted in the year 1896.   Laws Utah 1896, page 238,
chapter 80.   As first written the section, in addition to the
italicized words, after the words "school district bonds"
contained the following words, "or in first mortgages on im
proved farms within the state."   The act was in some par-
ticulars amended and re-enacted in the year 1897.   Laws
Utah 1897, page 61, chapter 37.   The italicized words re-
mained precisely as they were in the act as originally passed
in 1896.   In 1899 (Laws Utah 1899, page 85, chapter 64) the
act was again amended and re-enacted.   The italicized words
were left the same, but, after stating that the funds could be
invested in first mortgages, the following words were added
"or otherwise as provided by law."   In 1903 (Laws Utah
1903, page 54, chapter 62) the particular section limiting
the kinds of securities in which the funds could be invested
was again amended by adding the words "or notes of the
state made under the provisions of chapter 8 of the Laws of
Utah, 1899."   The italicized words were, however, re-enacted

precisely as in all the former changes or amendments. The act was again amended in 1905 (Laws Utah 1905, page 34, chapter 36), when the language respecting the kinds of securities in which the funds should be invested was left precisely as it was originally adopted. The section was again amended in 1907 (Laws Utah 1907, page 145, chapter 115). The kinds of securities in which the school funds should be invested were again extended by adding the following words: "Or in scrip or warrants issued against the funds to be raised by special or local taxes or assessments under the provisions of the laws of the state of Utah." The words in italics were, however, left precisely as before. In that form the section was finally incorporated into Comp. Laws Utah 1907 as section 2357. The section was again amended in 1911 (Laws Utah 1911, page 100, chapter 71). In that amendment the kinds of securities in which the funds should be invested were again enlarged by adding the words "irrigation district or drainage district bonds." Otherwise the section remained precisely the same as before. In 1915 (Laws Utah 1915, page 43, chapter 37) the kinds of securities were again enlarged by adding the words, "or in warrants on the Reservoir Land Grant Fund issued under the provisions of section 6 of chapter 116, Laws of Utah 1909." Otherwise the language remained the same. The law was finally amended in 1919 (Laws Utah 1919, page 308, chapter 109). The amendment, however, has no particular bearing upon the question involved here, except that the language with respect to the kinds of securities in which the school land funds should be invested was left as before.

I have been thus specific and careful in noting the nature of the foregoing amendments for the purpose of showing (1) that the language with respect to the investment of the school land funds as originally enacted was never changed in so far as the investment should be made "in government, state, county, city, or school district bonds," which are the italicized words before referred to; and (2) that whenever the right of the Land Board to invest the funds was enlarged the kinds of security in which the funds should be invested were specifically designated.

It is of the utmost importance, therefore, to bear these facts in mind when we seek for the intention of the Legislature respecting the kind of security in which the funds should be invested by the Land Board.

Let me pause here for a moment to determine the nature of the language which is in question here. It will be observed that the language is mandatory in letter, in spirit, and in its purport. The language is to the effect that the Land Board *shall* invest the funds in the designated securities. It must also be kept in mind that whenever the Legislature deemed it proper to enlarge upon the kinds of securities in which investments should be made it distinctly specified what these securities should be, precisely as was done when the act was first adopted. I make this statement as conclusive proof that no discretion whatever was ever vested in the Land Board respecting the kinds of securities in which the funds should be invested. Again, the language shows two limitations: (a) That the funds *shall* be invested "on account of the specific purposes for which the lands were granted"; and (b) that they shall be invested in the kinds of securities designated in the act. The language with respect to these matters is simple, clear, plain, and free from all ambiguity, and hence free from uncertainty. Moreover, no difficulty whatever arises in ascertaining the meaning of the language by reason that there is some other statute which must be considered as *in pari materia* with the one under consideration. The statute with respect to the rules of construction to which I shall hereinafter refer is not *in pari materia,* and hence cannot be considered upon that phase of the case. 2 Lewis, Suth. Stat. Const. (2d Ed.) sections 443, 444. The language being free from all ambiguity and uncertainty with respect to the kinds of securities in which the funds shall be invested, there is no room for construction; and the court is powerless, therefore, to expand or to restrict the ordinary and usual meaning of the language used, or to add to or to take away anything therefrom.

In this connection it must be borne in mind that the cities and towns of this state are by law segregated into distinct

classes, with governments entirely different in many respects. From the legal point of view therefore—and that is the only view in which the word "city" is mentioned in the act and can be considered—the term "city" does not include town unless there is something in the statute itself which indicates such an intention. There not only is nothing in the statute in question indicating such an intention, but the very contrary is clearly manifested.

Let me refer briefly to a few of the cardinal canons and rules of construction. In 2 Lewis' Suth. Stat. Const. section 366, the primary or first rule is stated to be that the meaning and intention of the lawmaker must be determined from "the words and language employed; and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation." Again, it is said in section 367: "There is no safer or better settled canon of interpretation than that when language is clear and unambiguous it must be held to mean what it plainly expresses." What, then, is the meaning of the language used in the act of 1896, and continued in force from that day to this so far as that language is now material? It is that the funds derived from the school land fund shall be invested "in government, state, county, city, and school district bonds." The primary indeed the foundation of all rules of construction that are employed to determine the meaning of language is that unless the words are used in a technical sense they must be given their usual and ordinary meaning and effect. There is not one word in the list to which I have referred that is not used in its ordinary sense and purport. The only word, however, that is here in question is the word "city." Even if the cities and towns of this state were not segregated into distinct classes, there still could be no doubt respecting the meaning of the word "city" as used in the section. Its usual and ordinary meaning, indeed its only meaning, is that "city," as used in the section, was intended to include a city of the first, second,

or third class; that is, a city as it is known to our law and
nothing else.   In this connection it is of the utmost import-
ance that the object or purpose of the lawmaker be kept in
mind.   The statute in question does not deal with the rights,
privileges, or duties of cities or towns; but its exclusive pur-
pose was to select and designate the kinds of securities in
which the Land Board should invest certain trust funds.
In view that under our statute town organizations are in-
ferior to city organizations, and belong to the lowest order
or class of municipalities, the legislators were not only justi-
fied in excluding town securities from the kinds in whch the
funds should be invested, but it was most natural that they
should do so.   The rule of construction is universally applied
and enforced that where things of a higher class or order
are enumerated, things of a lower or inferior class or order
must be deemed excluded, unless it appears from what is
said, in express terms or by unavoidable implication, that
those of a lower order were intended to be included.   Under
the construction now placed upon the statute, if A. enters
into a contract to purchase $100,000 of city bonds from B.,
B. might comply with the terms of his contract by offering
to deliver to A. either city or town bonds, although A. has
expressly agreed to purchase city bonds.   A lower class or
order of securities may thus be substituted for a higher and
superior class, and this may be done in the very teeth of the
terms of the contract.   That is precisely the effect of what
is permitted here.   No one, I think, will deny that it was
the exclusive province of the Legislature to select the kinds
of securities in which the funds should be invested, and it
is not for the Land Board, nor for this court, to substitute
others for those that were selected merely because such others
may partake of the same nature or may be deemed as secure
as those that were selected.   To do that is to deny the Legis-
lature the right of choice.   To my mind, there is no escape
from the conclusion that under every rule of construction
it is the duty of this court to hold that town bonds were in-
tentionally excluded from the kinds of securities selected.

Referring again to 2 Lewis, Stat. Const. section 366, it is
there said:

"The statute itself furnishes the best means of its own exposition; and if the sense in which the words were intended to be used can be clearly ascertained from its parts and provisions, the intention thus indicated will prevail without resorting to other means of aiding in the construction."

The rule is so well and so clearly stated by Mr. Justice BREWER, in his inimitable style, in *United States* v. *Goldenberg*, 168 U. S. at page 102, 18 Sup. Ct. at page 4, 42 L. Ed. 394, that I take the liberty of quoting what is there said. The Justice said:

"The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used. He is presumed to know the meaning of the words and the rules of grammar. The courts have no function of legislation, and simply seek to ascertain the will of the legislator. It is true there are cases in which the letter of the statute is not deemed controlling, but the cases are few and exceptional, and only arise when there are cogent reasons for believing that the letter does not fully and accurately disclose the intent. No mere omission, no mere failure to provide for contingencies which it may seem wise to have specifically provided for, justify any judicial addition to the language of the statute."

In this case, therefore, if the court confines itself to the language of the statute, as it is required to do, there is absolutely nothing to justify a holding that the Legislature intended to include any class of securities other than those that are expressly mentioned in the statute. It is only when recourse is had to another statute, which has absolutely no connection with the one in question, and which was intended to and can apply only in cases where uncertainty and doubt arise from the language used in the statute, that any doubt is created as to the meaning of the word "city" in the statute now under consideration. That other statute cannot be used to create a doubt. It can only be applied where the meaning is not clear and manifest. The statute relied on provides: "The word 'town' may mean incorporated town, and may include cities; and the word 'city' may mean an incorporated town." That statute merely states a rule of construction which has been in force for at least several centuries in England, and has been incorporated into the

Prayer for Mandamus.    Writ issued

Codes of many of the states of the Union, while in other states the rule is applied without being expressed in the statutes. It is therefore no more than a declaration of the common law upon the subject.

It goes without saying that it often occurs that a town is intended to be included in the word "city," and vice versa. When that is the case, however, there is always something in the context which indicates the sense in which the word "city" or "town," as the case may be, was used. The concrete cases clearly illustrate the doctrine just stated. Such is the case in *Burke* v. *Monroe*, 77 Ill. 610, *Trueman* v. *Village of St. Maries*, 21 Idaho, 632, 123 Pac. 508, and *State* v. *Harbor Line Com'rs*, 4 Wash. 6, 29 Pac. 938. Upon the other hand, in those cases where there was nothing to indicate that the word "city" or the word "town" was not used in its ordinary sense, the courts have held that the word "city" does not include a town. In *Welch* v. *Post*, 99 Ill. 471, the statute referred to "villages, cities, counties and townships," and it was held that incorporated towns were excluded. The court, in passing on the meaning of the words used, said: "What seems to have been deliberately omitted * * * cannot be supplied by judicial construction." To the same effect is *Day* v. *Morristown*, 62 N. J. Law, 571, 41 Atl. 964, *Wight* v. *Wolff*, 112 Ga. 169, 37 S. E. 395, and *Anderson* v. *Blakesly*, 155 Iowa, 430, 136 N. W. 210. The case last cited affords a striking illustration of the mischief that might result from a careless or loose substitution of the word "town" for the word "city."

I know of no instance, have heard of none, and have found none in the books where the Legislature so persistently and consistently manifested its intention to exclude the securities of towns from the kinds of securities in which the school land funds should be invested as in this case. Here the Legislature amended the act, in which it created and empowered the Land Board to invest the school funds, and in which it designated the kinds of securities in which such funds should be invested, nine times, and in each change persisted in using the precise words, so far as cities were concerned, as were

originally used. Moreover, when any change was made in the kinds of securities in which the funds should be invested, the kinds were specifically designated. Under such circumstances, to hold that the Legislature intended to use the word "city" interchangeably with "town" not only does violence to every known rule of construction, but it ignores and repudiates the very meaning of the words used.

It is, however, insisted that the contention of the Land Board should prevail upon the theory of what is termed "contemporaneous construction." In this case it would mean that the Land Board must succeed because it had construed the statute to mean that where the word "city" is used by the legislators it includes a town. In other words, that when the Legislature designated that the funds should be invested in city securities it likewise meant town securities. A number of cases and other authorities are cited and quoted from which, it is urged, support this contention. I have no quarrel with the doctrine announced in those cases and authorities. Indeed, the doctrine is wholesome and sound when applied to proper cases. But it has no application here. First, then, what is meant by "contemporaneous construction"? And under what circumstances may it be invoked? In 2 Lewis' Suth. Stat. Const. (2d Ed.) section 472, the rule is stated thus:

"The aid of contemporaneous construction is invoked where the language of a statute is of doubtful import and cannot be made plain by the help of any other part of the same statute, nor by the assistance of any act in pari materia which may be read with it, nor of the course of the common law up to the time of its enactment. * * * A contemporaneous construction is that which it receives soon after its enactment."

In the succeeding section it is said:

"Long usage is of no avail against a plain statute; it can be binding only as the interpreter of a doubtful law, and as affording a contemporary exposition."

In Black, Interp. Laws (2d Ed.) pages 40, 41, the author, in discussing the question of when and under what circumstances contemporaneous construction may be invoked, says:

"It is properly resorted to to illustrate and confirm the text, to

explain a doubtful phrase, or to expound an obscure clause. And the credit to which it is entitled is in proportion to the uniformity and universality of that construction, and the known ability and talents of those by whom it was given. But it is to be resorted to with much qualification and reserve. 'It can never abrogate the text; it can never fritter away its obvious meaning; it can never narrow down its true limitations; it can never enlarge its natural boundaries.' "

Now, what are the facts here? The Land Board, for our information, has furnished us with a list of investments that have been made in town securities. That list is conclusive proof that the construction that the board relies on, to say the least, is not a contemporaneous construction. It is the very reverse of that. The law, as I have pointed out, in so far as investments in city securities are concerned, was first passed in 1896. From the record of the Land Board as first presented the first investment that was made in town bonds was in 1909. From a letter later written by the clerk of the Land Board it now seems that the first investment was in 1906. To my mind it is neither very clear nor very material which is the correct date. In either case no investments in town securities were made until either ten or thirteen years, as the case may be, after the law was passed, and not until the law had been amended or changed either five or six times. Up to that time the investments were limited to the kinds of securities specified in the law itself. If, therefore, there was any contemporaneous construction at all, it was in favor of the law as written and not as now construed. But I most respectfully submit that there is no merit in the claim of contemporaneous construction, because the law as written was plain, simple, and free from ambiguity, and hence no construction was permissible.

It is contended that the author in Black, Inter. Laws (2d Ed.) section 94, supports the contention, and he is quoted from at some length. If all that Mr. Black says upon the subject in section 94 is considered, then there is absolutely no conflict in his statements. In referring to contemporaneous, or what he in that section calls "practical construction," he says:

State Board of Land Com. v. Ririe, 56 Utah 213

"The courts cannot be controlled by them, for the reason that the courts alone are invested with the power and charged with the duty of putting a final and authoritative interpretation upon the laws. And if the statute to be construed is a recent one—so that official action cannot be seriously deranged, nor private rights be very much affected, by a change in its interpretation—the mere fact that subordinate officers have already begun to read it in a certain way and to regulate their actions accordingly will have no weight or influence with the courts in their search for the' true meaning of the law."

The foregoing statement applies to this case in every particular except that the law was not of recent enactment. That fact, however, as I have pointed out, militates against the claim of contemporaneous construction rather than supports it, for the reason that for at least ten and perhaps thirteen years after the law was passed, and during which time it was changed and amended five or six times, all investments under it were limited to the kinds of securities specified in the act. No rights whatever, either public or private, have grown up under it, and the only result that can possibly follow the application of the law as written is to prevent the Land Board from further transgressing its plain provisions. That, in the very nature of things, can, however, only be wholesome, and, in the end, beneficial in many ways, since it will be notice to all officials to remain, so far as possible, within the letter of the law.

Nor can the other cases quoted from by Mr. Justice GIDEON in his opinion have any controlling influence here. The case of *Bloxham* v. *Consumers' L. & S. R. Co.*, 36 Fla. 519, 18 South. 444, 29 L. R. A. 507-509, 51 Am. St. Rep. 44, was in one aspect only a proper one for the application of the doctrine of contemporaneous construction. The statute upon its face was doubtful in that the question was whether the word "railroad" applied to street railroads or was limited to steam railroads. The executive officers had construed the statute so as to apply it to street railroads as well as to steam railroads, and the court, independently of such a construction, held that street railroads were included within the term "railroads." The court, however, referred

to a prior contemporaneous construction, but that did not have controlling influence in determining the meaning of the statute.   In *City of Louisville* v. *Louisville School Board,* 119 Ky. 574, 84 S. W. 729, also quoted from by Mr. Justice GIDEON, the court said: "We are of opinion that, on the face of the statute, the claim of the school board is without foundation." It is somewhat difficult to perceive how the prior contemporaneous construction could influence the court if the statute upon its face indicated the intention of the lawmakers to such an extent that a contrary claim had no foundation.   The case of *Van Veen* v. *Graham County,* 13 Ariz. 167, 108 Pac. 252, is also quoted from.   In that case the statute was doubtful in that the term "actual traveling expenses" was used, and the question was whether the term included all the expenses of sustenance while the official was away from home on official business, or whether he was limited merely to traveling expenses.   The executive officers had held that it included all expenses, and the court so held. Neither that case nor the Louisville case is of controlling influence here.   The only case in which the doctrine of a contemporaneous and long acquiesced-in construction was actually applied is the case of *State* v. *Sheldon,* 79 Neb. 455, 113 N. W. 208.   In that case it appeared that the statute providing for the manner of assessing railroads had been construed and applied by the state and county officers without protest for a period of more than forty years.   It was therefore held that the construction placed upon the statute by the officers should prevail, although the correctness of the construction in some respects was doubtful.  It will be observed however—and that is the thought I desire to impress—that in all of the cases referred to a doubt arose upon the face of the statute and an interpretation of the meaning of the language contained therein was absolutely necessary.   Moreover, in some of the cases a different construction by the courts would have unsettled and disarranged the adjustment of public affairs to a large degree.   We have no such case to deal with here.

Neither can I yield assent to the proposition that either this court or the Legislature was required to take notice of

the construction placed upon the statute in question after the year 1906 or 1909 by the Land Board. It is true, as suggested, that our statute (Comp. Laws Utah 1917, section 7076), so far as material here, provides that courts take judicial notice of the "public and private official acts of the legislative, executive, and judicial departments of this state and of the United States." Just what is meant by the private official acts I am unable to grasp. That question has, however, no relevancy here, and hence may be ignored. By the public official acts of the departments referred to I make bold to assert, however, that it was not intended that either this court or the legislative department should be required to take judicial notice of all the administrative acts of boards or other officers that may be considered a part of the executive department of this state. Neither this nor the legislative department is required to take notice of the various contracts that any board or officer may enter into, or the various business transactions it or he may have with private citizens, or even municipal corporations. To hold that any department, whether judicial or legislative, is required to take notice of all the acts of inferior boards and all inferior officers is to require such departments not only to take notice of all the proceedings of such boards and officers, but requires such departments also to take notice of all the correspondence and every act or transaction that may arise in the course of the business intrusted to such boards or officers. This court would thus be required to take notice of all that transpires in the offices of the Secretary of State, of the State Auditor, of the State Treasurer, and of all other state officers. That would place a burden upon this and all other departments of the state government which would be utterly impracticable, and would tend to confuse rather than to bring about an orderly and a reasonably expeditious and safe administration of justice. The rule applicable here is well stated in 16 Cyc. page 904, in these words:

"To require courts to notice not only the regulations of prominent executive officers, state or national, but also what they do in discharge of their legal powers, would impose a burden of multi-

tudinous details, often of slight importance, and more familiar to litigants than to the court.  Dispatch of business is usually served by requiring such facts to be proved."

Then follows an enumeration of the character of executive acts of which the courts are required to take judicial notice. In my judgment, the foregoing is a plain and sound exposition of the law.  Any other course must inevitably lead to interminable turmoil.  In view of the foregoing, and in view of the fact that the Legislature from first to last, in express terms, specified the several kinds of securities in which the funds should be invested, there is no basis for the contention that the Legislature adopted the construction that was placed upon the statute after 1906 or 1909 by including town securities.

I have thus shown that the Legislature for twenty-three years persistently and consistently used the same language in designating the kinds of securities in which the school funds should be invested, and that whenever it deemed it necessary to change the kinds of securities in which the funds might be invested it in express terms designated the kinds of securities in which the funds should be invested. What better method could the Legislature have adopted in emphasizing its intention respecting the kinds of securities in which investments should be made?  It had from the very inception of the law specifically mentioned and enumerated the several kinds of securities in which the funds should be invested.  By pursuing this method all securities not mentioned were necessarily excluded from the list specified.  According to the arguments now advanced, however, it seems that the Legislature, in addition to particularly specifying the various kinds of securities, should also in express terms have excluded all others.  That is the effect of the holding, and in view of that, the decision is not only contrary to all rules and canons of construction, but may prove exceedingly harmful in the future.  Suppose this court for a period of twenty-three years had constantly applied the same language in determining a particular question, what possible effect would be given to the argument that because some of-

ficer or some one else had applied the decision otherwise than as it was written, this court was required to declare that it meant precisely the contrary of what it said, and, in the event that it failed to do so, it might be urged that it adopted the construction of such officer or other person? Courts are, and of right should be, jealous in guarding their decisions, and when deliberately declared should not permit any one to disregard them upon the flimsy ground that he placed a different meaning upon them than justified by the language used. The courts should, however, if possible, be more jealous in guarding the law as it is written by the lawmakers; and, unless there is something in the law manifesting the contrary intention from that which the ordinary meaning of the language implies, the courts should adhere to the law as written. In this case, therefore, the contentions of the Land Board should not prevail, (1) because the language of the statute which it has attempted to construe is simple, plain, and free from all ambiguity; (2) because that language has been steadfastly adhered to for practically twenty-three years without a change; (3) because for more than ten years after the statute was enacted its language and meaning were followed; (4) because to construe the statute as contended for by the Land Board results in applying the words ''city'' and ''town'' interchangeably and as meaning the same thing; (5) because the Legislature has clearly, and at numerous times and in many ways, indicated that such was not its intention, for the reason that every time that it became necessary to mention a town or towns such has invariably been done in terms, and there is not a single statute of which I have any knowledge in which such was not the case—there is, therefore, no room for construction; (6) because to refuse the writ in this case simply arrests unauthorized acts, and can neither affect any vested rights nor hamper the execution of any law; and (7) because, if there are any changes to be made in the law and in the kinds of securities in which the funds shall be invested, the changes should be made by

the lawmaking power precisely as has been done in amending and changing the statute numerous times.

The alternative writ should therefore be quashed, and a peremptory writ denied.