**STATE OF ALABAMA**
v.
**The UNITED STATES.**
No. 16–71.

United States Court of Claims.
June 16, 1972.

---

**23.** Defendant's Brief, p. 6.

Richard C. Belser, Montgomery, Ala., attorney of record, for plaintiff.

Arthur D. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, and KUNZIG, Judges.

## ON DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

DURFEE, Senior Judge:

Plaintiff claims that it is entitled to twenty-five percentum *of all moneys received* from all sales of forest products from National Forests in Alabama for aid to State schools and public roads, and that the amounts thus made available should be based upon *the stumpage value of the timber* under Sec. 13 of the Weeks Act, 36 Stat. 963 (1911) as amended, 16 U.S.C. § 500, which provides in pertinent part:

*Twenty-five per centum of all moneys* received during any fiscal year from each national forest shall be paid, at the end of such year, by the Secretary of the Treasury to the State in which such national forest is situated, to be expended as the State legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which such national forest is situated: * * * In sales of logs, ties, poles, posts, cordwood, pulpwood, and other forest products the amounts made available for schools and roads by this section shall be based *upon the stumpage value of the timber*. [Emphasis supplied.]

Defendant contends that the revenue base, *i.e.*, "stumpage value" from which the twenty-five percent is computed for payment to states for schools and roads *does not include* sale area deposits collected from the purchaser pursuant to the Knutson-Vandenberg Act. Section 3 of this Act, 46 Stat. 527 (1930), 16 U.S.C. § 576b provides in pertinent part:

The Secretary of Agriculture may * * * require any purchaser of national-forest timber *to make deposits of money in addition to the payments for the timber*, to cover the cost to the United States of (1) planting * * * (2) sowing with tree seeds * * * or (3) cutting, destroying, or otherwise removing undesirable trees or other growth, on the national-forest land cut over by the purchaser, in order to improve the future stand of timber: * * *. Such deposits shall be covered into the Treasury and shall constitute a special fund, which is appropriated and made available until expended to cover the cost to the United States of such tree planting, seed sowing, and forest improvement work, as the Secretary of Agriculture may direct: Provided, That any portion of any deposit found to be in excess of the cost of doing said work shall, upon the determination that it is so in excess, be transferred to miscellaneous receipts, forest reserve fund, as a national-forest receipt of the fiscal year in which such transfer is made * * *. [Emphasis supplied.]

The administration of this statute was vested by the Secretary of Agriculture in the Forest Service, which by long standing administrative practice and regulation, has adopted the following procedures:

Prior to offering a tract of National Forest timber for sale, the conservation and silvicultural needs of a proposed sale area are determined. The cost of reforestation and other sale area betterment work is estimated, and pursuant to the Knutson-Vandenberg Act, *supra* this estimate is collected from the purchaser (said amount is herein referred to as "K-V deposits"). Until 1959, the purchase ("stumpage") price of the timber and the K-V deposits were collected and handled separately. After 1959, "stumpage rate" was redefined to include K-V deposits by the Forest Service for purposes of administrative convenience.

It has been defendant's consistent practice to deposit initially payments for National Forest timber in a temporary suspense account. As the timber is harvested, the portion of the payments representing K-V deposits is transferred to a special account where it is then available for carrying out sale area betterment work. The balance of the timber payments is periodically transferred to the National Forest Fund. In addition, any amounts of K-V deposits which are found to be in excess of sale area betterment needs are similarly transferred to the National Forest Fund.

The essence of the dispute arises over the difference in interprepation of "stumpage value of the timber" in the Weeks Act, *supra*.

Plaintiff interprets "stumpage value" in the Weeks Act to mean *all moneys paid* to the United States for the purchase of the timber, and from which it is entitled to twenty-five percentum.

Defendant contends that since the Weeks Act and the Knutson-Vandenberg Act both deal with the same subject matter, and with the same transaction, *i.e.*, the sale of National Forest timber, these two statutes must be interpreted in *pari materia* and we accept this position as being in accord with the legislative intent of the Congress.

The Knutson-Vandenberg Act defines K-V deposits as being "in addition to the payments for the timber." Initially, the procedures adopted by the Forest Service for implementation of the Act, in conjunction with the Weeks Act, kept payments for the timber, then termed "stumpage payments," separate from K-V deposits. In appraising National Forest timber, the amount estimated for sale area betterment work was treated as a cost to the purchaser of harvesting

timber. In advertising timber for sale, the amounts of required K-V deposits were listed separately, and stated to be in addition to the payments for timber.

From 1955 through 1965, there were a number of administrative changes in the forms used for advertisement and sale of National Forest timber and in the details of K-V collections. These changes were adopted "to facilitate administration of timber sales and handling receipts therefrom." As stated in the affidavit of the Director of the Division of Timber Management of the U.S. Forest Service, one such change was the pooling of K-V funds by proclaimed National Forests after 1955. Another such change was the *redefinition of* "stumpage rate" in 1959 to include deposits for sale area betterment. These and other changes during this period are reflected in current sale procedures.

However, the result obtained either before or after this administrative change is the same. The K-V assessments reduce the money received in payment for the timber itself by the amounts established to perform sale area betterment work in the same way as any other contract condition which makes it more costly for the purchaser to harvest National Forest timber. Instead of the original practice of the purchaser to bid on the "stumpage value" separately from the K-V deposits, the amounts of K-V deposits required for a particular sale area are now deducted from a proportionately higher price bid.

Stumpage value or "stumpage" is commonly defined as "the value or price paid for timber as it stands uncut in the woods; uncut marketable timber." *Webster's Third International Dictionary* 1966. However, in practice, the price paid for National Forest timber is not the actual market price, as generally determined. An appraisal is first made by the Forest Service of the timber in the sale area which is marked for cutting. An estimate is made of the average value of the products which can be produced from the standing timber by an average operator, together with an estimate of the costs of logging and manufacturing (including conservation measures required by contract). A margin for profit and risk is then deducted from the estimated value of the timber products. This leaves a residual "appraised value" or "stumpage value" which establishes the *minimum amount* the Forest Service will accept from prospective purchasers. This *minimum* appraised "stumpage value" includes, for administrative accounting purposes, the amounts which will be allocated as K-V deposits as well as amounts which will be allocated as payment for the timber. It follows that the states do not actually participate in an allocation of payments for "stumpage value" as determined by competitive bidding in an open timber market without any minimum fixed base price. Plaintiff contends that this practice of the Forest Service results in an "administratively diminished adjustment" by administrative fiat which is "not in accord with the clear Congressional direction." We do not agree.

This long continued administrative practice is in accord with "[The] [p]urposes for which natural forests may be established and administered," 16 U.S.C. § 475, which provides in pertinent part:

> * * * No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and *to furnish a continuous supply of timber for the use and necessities of citizens of the United States* * * *. [Emphasis supplied.]

The State of Alabama and all the other states have collectively an equal interest in this long-term national purpose of conserving our forest resources. They benefit equally from this national purpose, and any excess of K-V deposits required therefor by the Forest Service goes into the National Forest Fund for percentum distribution to the States.

The Knutson-Vandenberg Act does not require deposits *in addition to the value*

*of the timber,* but rather *"in addition to the payments for timber."* The administrative practice by the Forest Service observes and follows this clear legislative distinction in its allocation of these two separate sources of revenue, *i.e.,* K-V deposits and "payments for timber." The percentage payments to which the States are entitled should be based only upon the Federal revenues which represent payments for timber only, apart from the costs of harvesting timber on a sustained yield basis as administered by the Forest Service for over forty years.

The Forest Service has historically interpreted the Knutson-Vandenberg Act, 16 U.S.C. § 576b, to define K-V deposits as being in addition to payments for the timber. Thus, except to the extent that it is found to be in excess of sale area betterment needs and, therefore, transferred to the National Forest Fund, money collected for sale area betterment has not been subject to revenue sharing under 16 U.S.C. §§ 500 and 501 nor has such money been taken into account in calculating payments under these statutes. Other similar deposits may be collected from purchasers to reimburse the Government for performing other types of work on sale areas. Like K-V deposits, these moneys are excluded from the National Forest Fund, and thus from percentage payments under 16 U.S.C. §§ 500 and 501. By 16 U.S.C. § 490, the Forest Service is authorized to require brush disposal deposits (B.D. deposits) from timber purchasers. Like K-V deposits, excess B.D. deposits are to be transferred to the National Forest Fund.[1]

A comparison of the provisions of 16 U.S.C. § 490 (the Brush Disposal Act) with those of § 576b, (the K-V deposit section), and an examination of the legislative history of the latter, indicates that these two sections should be read in *pari materia.* The Senate Report which accompanied the bill containing the progenitor of § 576b for K-V deposits described the language of that section as being analogous to that contained in the Act of August 11, 1916 which authorized "similar *deposits* for the purpose of disposing of brush and other debris resulting from timber-cutting operations on national forests * * *." S.Rep. No. 375, 71st Cong.. 2d Sess., 4 (1930). [Emphasis supplied]. The legislative history of 16 U.S.C. § 490 leaves little doubt that the *deposits* to be made for the purpose of brush disposal were merely a substitute for the purchaser's performing this work himself and constituted a "special fund"; moreover, any amounts which were so *deposited* and which were later found to be in excess of the amount required for brush disposal were refunded to the *depositor.* This latter provision was subsequently amended in 1950 to provide that any excess amounts would be *deposited* in the Forest Reserve Fund. Section 576b also provides for *deposits* to be made to a "special fund," and that these *deposits* are to cover the cost to the United States of performing certain functions directed towards improving the future stand of timber in the area cut over by the purchaser. Moreover, this section specifically provides that *these* deposits are "in addition to the payments for the timber." As in the case of *deposits* made for the purpose of brush disposal, K-V deposits are directly equatable with certain costs incurred by the Government in conserving timber resources in the area in which the purchaser-depositor has been

---

1. The Act of August 11, 1916, 39 Stat. 462, as amended, 16 U.S.C. § 490 provides:

   "Purchasers of national-forest timber may be required by the Secretary of Agriculture to deposit the estimated cost to the United States of disposing of brush and other debris resulting from their cutting operations, such *deposits* to be cov-
   ered into the Treasury and constitute a *special fund,* which is appropriated and shall remain available until expended: *Provided, That any deposits in excess of the amount expended for disposals shall be transferred to miscellaneous receipts, forest-reserve fund, to be credited to the receipts of the year in which such transfer is made."* [Emphasis supplied.]

at work. Congress viewed the brush disposal and K-V deposits as being preferable substitutes for requirements for these purposes by the purchaser of National Forest timber. It is only when these deposits are in excess of these actual costs that § 576b provides in the second proviso, that certain portions of the sums so received can be characterized "as a national forest receipt of the fiscal year in which such transfer [to the Forest Reserve Fund] is made * * *," and, thus, considered "moneys received during any fiscal year from each national forest" within the meaning of 16 U.S.C. § 500. To hold otherwise would be to ignore the purpose underlying these deposits, the distinction made between deposits and payments for timber, and the second proviso of § 576b, quoted above.

██ The last sentence of 16 U.S.C. § 500 as to "stumpage value" does not alter this conclusion. This sentence, added in 1944, was inserted to preclude the Government's having to base percentage payments to the States from the sale of certain forest products upon receipts representing a return of production costs. Hearings on H.R. 5269 before the Sen. Subcomm. of the Comm. on Appropriations, 76th Cong., 1st Sess., 325–26 (1939). This amendment, therefore, in the case of these products, was to further limit the base to which the percentage would be applied and cannot be construed as causing the inclusion in this base of deposits made pursuant to § 576b. Both H.R.Rep. No. 1198, 78th Cong., 2d Sess., 12 (1944) and S.Rep. No. 803, 78th Cong., 2d Sess., 17 (1944) said, with respect to the 1944 amendment, that "[u]nder this language the receipts from sales of timber which will be available for percentage distribution under these acts will be limited to the value of uncut stumpage, which appears to have been the purpose of the original legislation, and such revenue will not include receipts based upon the expenditure of Government funds for converting the stumpage into certain other forms."

The affidavit of Paul E. Neff, Director of Timber Management, U.S. Forest Service, establishes that since the enactment of 16 U.S.C. § 576b, and for over forty years thereafter, the Forest Service has consistently treated K-V deposits as being in addition to moneys which are subject to revenue sharing with States, under 16 U.S.C. § 500. The affidavit also demonstrates that the exclusion of K-V deposits from these revenue sharing provisions is consistent with the treatment of other required or voluntary deposits collected from timber purchasers.

This established administrative practice for over forty years has been made known and clearly explained to Congress repeatedly. See, e. g., Hearings on H.R. 2968 before Sub. Com. No. 3 of the Comm. on Agriculture, 81st Cong., 1st Sess., 23 (1949); Hearings before House Subcomm. on Forests of the Comm. on Agriculture, 90th Cong., 1st Sess., 109–11 (1967); Hearings on S. 1385 before the Senate Subcomm. on Public Lands of the Comm. on Interior and Insular Affairs, 90th Cong., 2d Sess., 20–22 (1968).[2] It has also been a matter of public record as published in the Forest Service Manual, Vol. 3, Title 7.

██ The law is well established that long standing administrative interpretation of a statute by the agency charged with its execution is entitled to great weight, and if reasonable, should be upheld. In Udall v. Tallman, 380 U.S. 1,

---

2. S. 1385 which sought to amend 16 U.S.C. § 500 by providing that twenty-five percent payments be based upon "the total amount paid or deposited by purchasers [including] deposits, sale area betterment deposits, erosion control deposits, and collections under the Act of June 9, 1930 (46 Stat. § 527, 16 U.S.C. § 576)," passed the Senate in 1968 but did not pass the House.

16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), the Supreme Court said:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." Unemployment Compensation Comm'n of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136. See also e.g., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; Universal Battery Co. v. United States, 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" Power Reactor Co. v. International Union of Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 * * *

■ We conclude that under the wording of the Knutson-Vandenberg Act, its legislative history and its long standing interpretation and administration by the Forest Service, amounts collected and expended for K-V deposits under the Knutson-Vandenberg Act, are not to be considered as receipts from the sale of National Forest timber resources subject to the revenue sharing provisions of 16 U.S.C. § 500.

Defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and the petition is dismissed.