NICHOLS, Judge (dissenting):

Upon a careful reading of *Economy Finance Corp. v. United States,* 501 F.2d 466 (7th Cir. 1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425 (1975), I find it applies the text in IRC § 801(a), defining a Life Insurance Company in a sound and persuasive fashion. To avoid needless expansion of these remarks, I incorporate herein the analysis of the panel majority by reference so far as pertinent here. Were they less convincing than they are—unless plainly wrong—our respect for *stare decisis* and our dislike for going into conflict with another court should have carried the day. The objectionable consequences of conflicting lines of decisions in Federal tax cases are fully set forth in the *Preliminary Report of the Commission on Revision of the Federal Court Appellate System,* App. IV. This deals with the "Relitigation Policy" attributed to defendant, but relitigation by diverse taxpayers pursuing a common scheme or plan of tax avoidance is just as objectionable.

Defendant, with the authority of the Seventh Circuit behind it, would "impute" to plaintiff reserves under H & A policies it has arranged to have ostensibly carried for it by others, though in reality it bears the risk of loss itself. When such reserves are so "imputed" the plaintiff fails to pass the 50% test and is not entitled to the special advantages enjoyed by life insurance companies. As the Seventh Circuit shows, non-imputation completely frustrates the purpose Congress has in mind in prescribing the test. The contrary view is simply another instance of stating: "we see what you mean, Congress, but you said it wrong." To a simple, uncomplicated mind, the imputation is fully justified by the ancient maxim: *"Qui facit per alium, facit per se."* Plaintiff maintains the reserves for purposes of the 801(a) test, though for no other purposes, because it has arranged, itself or through its affiliates, and using the economic leverage they jointly possess, to have these reserves available to satisfy the right the H & A policy holders possess to have their risks covered by legally acceptable reserves.

**CONSUMER LIFE INSURANCE COMPANY**
v.
**The UNITED STATES.**

**No. 463–70.**

United States Court of Claims.

Oct. 22, 1975.

E. Michael Masinter, Atlanta, Ga., attorney of record, for plaintiff; James H. Landon and Hansell, Post, Brandon & Dorsey, Atlanta, Ga., of counsel.

Herbert Grossman, Washington, D.C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Theodore D. Peyser, Jr., Washington, D.C., of counsel.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNET, Judges.

## OPINION

KASHIWA, Judge.

This is a single issue tax refund suit that arises out of a small loan company's entry into the insurance business through a wholly owned subsidiary that is formed especially for that purpose. The question is whether that subsidiary, the plaintiff in this proceeding, qualified for the tax treatment accorded a "life

insurance company" by § 801 et seq. of the Internal Revenue Code of 1954. We hold for the plaintiff.

This case is before this court on a review of a recommended decision of Trial Judge George Willi. The court disagrees with the conclusions. A similar case, *Penn Security Life Insurance Co. v. United States,* Ct.Cl., 524 F.2d 1155, is decided contemporaneously herewith. Issues decided therein and applicable herein are disposed of by reference to said decision; but as hereafter shown, plaintiff in this case has raised new questions based on state regulatory statutes. This decision discusses these state statutes which defendant claims are relevant.

The facts are fully detailed in the findings of fact accompanying this opinion and will be repeated herein only to the extent necessary to an understanding of the result reached.

In 1957 Southern Discount Company (Southern), a Georgia corporation, was operating a well established and successful consumer finance business. Its customer-borrowers typically purchased term life and accident and health (A & H) insurance at the time that they obtained their loans. The premium charge for the entire coverage involved was thereupon paid in full. The customers bought this protection, coextensive in both time and amount with the curtailment requirements of their borrowings, to provide a means of automatically servicing their debts to Southern in case of death or disability prior to full repayment. Georgia law prohibited Southern, as a loan company, from acting as an insurance underwriter with respect to such coverages. It was not forbidden, however, from functioning as a sales agent for insurance underwritten by a carrier duly qualified to conduct an insurance business in Georgia. American Bankers Life Insurance Company (American Bankers), a Florida corporation, was such a carrier.

Until 1957 Southern acted as a commission sales agent for American Bankers in respect to life and A & H insurance issued by the latter to Southern's borrowers. Under this arrangement, Southern received the maximum commission rate allowed by law; amounting to approximately 50 percent of the policyholder premiums. Despite the attractiveness of that return, for which it apparently had to do little more than place American Bankers' policies with its own borrowers, Southern concluded that it could reap even greater profits from this source if it could participate as an underwriter rather than just a sales agent. It was that determination that prompted Southern to form the plaintiff as a wholly owned subsidiary.

Southern surveyed state law to locate the jurisdiction that had the most modest capitalization requirements for a licensed insurer and found that it was Arizona. Plaintiff was organized July 1, 1957 as an insurance company under an Arizona charter with an initial balance of invested capital and paid-in surplus of only $38,000. These resources were not sufficient to permit it to qualify as a direct insurer under Georgia law. It could, however, use its Arizona charter authority to operate as a reinsurer of Georgia and North Carolina coverages written by American Bankers—a duly authorized insurer in both of those states. American Bankers was willing to enter into a reinsurance treaty arrangement with plaintiff, under which it surrendered substantially all underwriting profit in return for a relatively minimal fixed fee, because it knew that if it refused, Southern would have no difficulty in replacing it with another qualified carrier. Thus, its alternative was outright exclusion from the insurance business generated by Southern's borrowers. Thereupon, on June 28, 1957, American Bankers entered into the first of two consecutive insurance treaties (Treaty I and Treaty II, respectively) with the plaintiff.

Under Treaty I, all life and A & H policies issued by American Bankers to debtors of plaintiff's affiliates (including the parent, Southern) on and after July 1, 1957 were to be fully reinsured with

plaintiff which, as it freely concedes, thereby assumed the entire insurance risk represented by each of the policies involved; A & H as well as life. As compensation for its reinsurance function, plaintiff was to receive 87½ percent (later increased to 90½ percent) of all premiums collected by American Bankers from the policyholders. The timing of these payments by American Bankers to plaintiff differed, however, as between life and A & H, although the agreement required monthly remittances in each instance. As already noted, American Bankers collected all premiums in full at the inception of coverage. The Treaty stipulated that as to life policies, American Bankers was, at the end of each month, to pay plaintiff its entire share of all life premiums collected from policyholders during that month. As to A & H, however, American Bankers was to pay plaintiff only the portion of its total share of premium receipts during that month that was ratably allocable to that month's coverage; the agreement being to pay over the remainder monthly on a pro rata basis spread over the balance of the coverage period. Thus, in respect to A & H, plaintiff never actually held any premium dollars attributable to a future period of coverage and risk exposure.

Finally, Treaty I provided for termination by either party upon thirty days written notice to the other. Termination was to be wholly prospective, the relevant clause specifying: "Upon termination by either party, this agreement shall continue to apply to all policies reinsured hereunder before such termination becomes effective."

As required by state law, plaintiff filed annual reports of its activities under Treaty I with the insurance regulatory authorities in Arizona and Georgia. On those reports it characterized its life and A & H dealings differently. It did so by reporting both premium income and related reserves solely on the basis of actual dollar receipts for the year involved. This meant that for the life coverages it declared as premium income its entire percentage share of the premiums

paid by policyholders during that year. Consonantly, it reported the full tabular reserve for all of such policies. As to A & H, however, it limited reported premium income to the annual aggregate of the incremental payments that had been received monthly from American Bankers. Moreover, it showed nothing on the asset side of the report representing the premiums on existing A & H policies that it was entitled under the Treaty to receive in the future. With premium income and asset balances thus restricted, plaintiff reported no reserves whatever in respect to the A & H coverages that it reinsured under Treaty I. As to those coverages, American Bankers included on its own annual reports an unearned premium reserve based on the amount of A & H premiums collected from policyholders but not yet paid over to the plaintiff. Neither the Georgia nor the Arizona regulatory authorities ever challenged or disapproved the method by which plaintiff reported its A & H reinsurance activities under Treaty I.

By 1962 plaintiff had accumulated enough earnings from operations under Treaty I to enable it to qualify as a direct insurer under Georgia and North Carolina law. It thereupon applied for and received such authority from the State of Georgia. From then on plaintiff operated as the issuing company on all life and A & H policies sold to the loan customers of Southern and its affiliates. Treaty I, in which plaintiff's role was solely that of a reinsurer, was consequently no longer suited to its purposes. Accordingly, effective March 1, 1962, plaintiff and American Bankers entered into a new insurance treaty under which their roles were reversed; plaintiff functioning as the issuing or ceding carrier and American Bankers denominated the "reinsurer".

Treaty II applied only to A & H insurance; plaintiff having determined to underwrite all future life insurance by itself. The treaty provided that plaintiff, as the issuing or ceding company, would reinsure 80 percent of all future A & H policies with American Bankers. To

that extent, plaintiff was to pay over to American Bankers on a quarterly basis all of the premiums collected from policyholders, American Bankers to return 50 percent of such amounts to the plaintiff as commissions. The Treaty contained a clause, entitled Experience Refunds, establishing a quarterly rebate due plaintiff in the amount of the total premium dollars ratably allocable to the expired portion of the term of policies for which such premiums had been collected, less the following deductions: (a) the amount of commissions paid plaintiff that was proportionate to the expired portion of the term of policies on which such commissions had been paid; (b) 3 percent of the earned premium dollars previously described; and (c) the sum of all claim payments made to plaintiff during the quarter by American Bankers as reinsurer. For all practical purposes, this clause served to fix American Bankers' stake in the undertaking at a flat 3 percent of the premium dollars that it initially received from the plaintiff. Only if loss experience under the reinsured coverages exceeded 47 percent of premiums would American Bankers' 3 percent return be encroached. Moreover, such a pattern of adverse experience would have had to persist for the ensuing twenty consecutive quarters before such an encroachment became permanent. Loss experience on A & H policies under Treaty I had ranged from 28 to 30 percent. Finally, there were no circumstances under which American Bankers' return under Treaty II could exceed the 3 percent allotted to it therein.

On its annual reports to the state regulatory authorities covering 1962 and subsequent years, plaintiff declared no reserves relative to that portion of the A & H policies covered by the reinsurance language of Treaty II. Again, no state regulatory authority took exception to this aspect of plaintiff's reports.

The insurance industry is regulated by the states. A particular insurance company must meet the various industry requirements of its home state, and must satisfy the requirements of all states in which it is qualified to act as an insurer. The state requirements include standards for investments, maintenance of reserves, and accounting practices. The state insurance departments supervise policy forms, agency relationships, and the general financial activities of the companies within their jurisdictions. This regulation is designed to preserve the solvency of the insurance companies for the protection of the policyholders. To implement their regulatory function, state insurance departments require companies to file annual reports. Because reports are required in all states in which a company is qualified to act as an insurer, a standard report form has been developed by the National Association of Insurance Commissioners, which is used in all fifty states. These reports disclose, among other things, the reserves being maintained by each company.

In addition to requiring annual reports, the various state insurance departments conduct regular triennial examinations of insurance companies. Where the volume of business warrants it as to a particular company, it is customary for representatives of several state insurance departments to work together on these examinations. The examinations are carried out at the offices of the company in question and may take as long as several months for large companies. Among the matters which are investigated in the course of such an examination are the reinsurance treaties to which a particular company is a party.

When a state insurance department is presented with a reinsurance agreement in existence between parties, its investigation will include a determination that each party has established adequate reserves according to its respective liabilities pursuant to the terms of the reinsurance agreement.

Plaintiff was the subject of triennial examinations in 1959 and 1963 by the insurance department of Arizona. American Bankers was the subject of

triennial examinations in 1960 and 1963. Participants in the 1960 examination were from the insurance departments of Florida, North Carolina, Georgia, and Texas; and participants in the 1963 examination were from the insurance departments of Florida, Georgia, Arizona, and Arkansas. The reinsurance treaties between plaintiff and American Bankers were examined in detail in the course of the aforesaid examinations. The existence of reserves for accident and health insurance held by American Bankers on the policies covered by those treaties was clear to the examiners. Also the maintenance of the reserves by American Bankers under the treaties during Period I and Period II was approved in the course of the four examinations; no requirement or even suggestion was made in the examination reports that the reserves should be otherwise maintained.

For each of the years 1958 through 1964 plaintiff computed its federal income tax liabilities and filed its returns on the premise that it was taxable as a "life insurance company" within the meaning of that term as defined by Section 801 of the Internal Revenue Code of 1954. On audit, the Revenue Service determined that plaintiff did not qualify as a life insurance company entitled to the preferential tax treatment accorded such an entity and assessed deficiencies accordingly (except for 1961 in which additional liability was fully expunged by other adjustments not in dispute). Plaintiff paid the assessments and upon formal disallowance of its seasonably filed claims for refund, brought this action in which the sole question for decision is that concerning plaintiff's qualification as a life insurance company for federal tax purposes in the years 1958, 1959, 1960, 1962, 1963, and 1964. ·

As pertinent here, Section 801 defines a life insurance company as follows:

SEC. 801 [as amended by Sec. 2, Life Insurance Company Income Tax Act of 1959, P.L. 86–69, 73 Stat.

112]. *Definition of life insurance company.*

(a) *Life Insurance Company Defined.*—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b) ), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c) ).

· * * * * * *

(c) *Total Reserves Defined.*—For purposes of subsection (a), the term "total reserves" means—

(1) life insurance reserves,

(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

(3) all other insurance reserves required by law.

The term "total reserves" does not include deficiency reserves (within the meaning of subsection (b)(4) ).

* * * * * *

Life insurance company status, it is seen, is made to depend solely on the character and composition of an insurance company's reserves. An insurance company merits life insurance company tax treatment if its life reserves amount to half or more of its total insurance reserves. Section 801(c) expressly directs that total reserves, the denominator portion of the fractional test, shall include three separate categories: (1) life reserves; (2) reserves for unearned premiums and for certain unpaid losses

(the latter element not being involved in this suit); and (3) all other reserves required by law.[1]

Sections 1.801–3(e) and 1.801–5(b) of the Treasury Regulations on Income Tax (1962), endorsed by both parties to the present controversy, define unearned premiums and reserves required by law, respectively, as follows:

> *Unearned premiums.* The term "unearned premiums" means those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance. Such term includes all unearned premiums, whether or not required by law.

> \*   \*   \*   \*   \*   \*

> *Reserves required by law defined.* For purposes of part I, subchapter L, chapter 1 of the Code, the term "reserves required by law" means reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, and which are reported in the annual statement of the company and accepted by state regulatory authorities as held for the fulfillment of the claims of policyholders or beneficiaries.

In this case there is no disagreement as to either the fact or the particular amount of plaintiff's life insurance reserves for each of the years in suit. Its qualification depends entirely on the question of its chargeability with reserves incident to the A & H policies to which it was a party under Treaties I and II; there being no dispute that reserves must be maintained by someone in respect to those policies. If those reserves are includable in plaintiff's total reserves, it concededly does not pass the

50 percent test of Section 801. If, as plaintiff says, they are chargeable to American Bankers rather than to itself, it does.

To dispel the notion that it was required to maintain A & H reserves of a type comprehended by Section 801, plaintiff relies on (1) the language of the two insurance treaties under which it operated with American Bankers; (2) the testimony of a well-traveled actuarial expert, Arthur Crooks Eddy; (3) the fact that the state insurance regulatory personnel tacitly approved plaintiff's annual report forms showing no A & H reserves; and (4) Trial Judge Fletcher's opinion in *Penn Security Life Ins. Co. v. United States* (Ct.Cl. No. 109–68, decided March 2, 1973).

Plaintiff's argument is simply that plaintiff was chargeable with no A & H unearned premium reserves because under both of the Treaties it received premium dollars only after the period of exposure to which those dollars related had expired. Accordingly, plaintiff says, since all the premiums that it received were, in point of time, already "earned" when it got them, there was no occasion for it to maintain a reserve for "unearned" premiums. Testifying as plaintiff's expert, Mr. Eddy repeatedly opined that this feature of the Treaties, governing custody of prepaid premium dollars, was dispositive of the participants' respective reserve obligations, *i. e.,* that since it was American Bankers that physically held all of the A & H premium dollars allocable to the unexpired portion of the terms of the underlying policies, it was American Bankers, not plaintiff, that was obligated to carry the reserves for those policies. In this regard, his testimony was the same as it apparently had been in *Penn Security, supra.* In the latter case, the relevant particulars of the factual situations involved were virtually identical to those presented by Treaty I.

---

1. The last-mentioned category has been traditionally and centrally implicated in the federal taxation of insurance companies. *See Brown* *v. Helvering,* 291 U.S. 193, 201, 54 S.Ct. 356, 78 L.Ed. 725 (1934), and cases cited therein.

■ Defendant's argument is that plaintiff's total reserves in the reserve ratio must include the unearned premium reserves on the accident and health policies because those reserves must be attributed to the company ultimately liable for the insurance risks. Alternatively, if the unearned premium reserves must be required by law to be recognized, they were so required here.

Issued contemporaneously with this opinion is the per curiam decision in *Penn Security Life Insurance Co. v. United States*, Ct.Cl., 524 F.2d 1155. That case involves life insurance company qualification and the provisions of § 801 dealing with health and accident insurance. The situation is similar to this case with that taxpayer reinsuring risks written by three unrelated insurance companies under credit life and accident and health policies on the lives and health of debtors of taxpayer's parent which made consumer loans through subsidiaries operating finance offices. That opinion disposes of the issue under § 801(c)(2), unearned premiums, with the court concluding against attribution to plaintiff of the unearned premium re-

serves held by the ceding companies. We, therefore, consider the question settled. However, this leaves for determination here the § 801(c)(3) issue, insurance reserves required by law.

■ The defendant's major argument in this case is that the reserves were required by law because Arizona Revised Statutes Annotated § 20–501(5) and (9)[2] apply in that the premiums were assets of the plaintiff because they were "in the course of collection" and they were "withheld by a solvent ceding insurer under a reinsurance treaty." We interpret these sections to mean that they refer to amounts already due and unpaid. The definition of assets under § 20–501 refers to items in the possession of the taxpayer or to which the taxpayer has an enforceable claim. Without including the unearned premium in taxpayer's assets, there can be no unearned premium reserve charged against that item. The Arizona provisions do not apply to plaintiff's circumstances.

■ Turning to the liability side of the statute, defendant argues that § 20–

2. § 20–501. *"Assets" defined*

"In any determination of the financial condition of an insurer, there shall be allowed as assets only such assets as are owned by the insurer and which consist of:

"1. Cash in the possession of the insurer, or in transit under its control, and including the true balance of any deposit in a solvent bank or trust company.

\* \* \* \* \* \*

"5. Premiums in the course of collection, other than for life insurance, not more than three months past due, less commissions payable thereon. The foregoing limitation shall not apply to premiums payable directly or indirectly by the United States or by any of its instrumentalities.

"6. Installment premiums other than life insurance premiums, in accordance with regulations prescribed by the director consistent with practice formulated or adopted by the national association of insurance commissioners.

"7. Notes and like written obligations not past due, taken for premiums other than life insurance premiums, on policies permitted to

be issued on such basis, to the extent of the unearned premium reserves carried thereon.

"8. The full amount of reinsurance recoverable by a ceding insurer from a solvent reinsurer and which reinsurance is authorized under § 20–261.

"9. Amounts receivable by an assuming insurer representing funds withheld by a solvent ceding insurer under a reinsurance treaty.

"10. Deposits or equities recoverable from underwriting associations, syndicates and reinsurance funds, or from any suspended banking institution, to the extent deemed by the director available for the payment of losses and claims and at values to be determined by him.

"11. All assets, whether or not consistent with the provisions of this section, as may be allowed pursuant to the annual statement form approved by the national association of insurance commissioners for the kinds of insurance to be reported upon therein.

"12. Other assets, not inconsistent with the provisions of this section, deemed by the director to be available for the payment of losses and claims, at values to be determined by him."

505 [3] requires that plaintiff establish reserves on the accident and health policies. It would appear from reading this statute that liabilities of an insurer "charged against its assets" implies that there were corresponding assets in the first place. Since there were not, this statute is inapplicable. Section 20–506A,[4] referring to disability insurance, provides that "every insurer shall maintain an unearned premium reserve on all policies in force." If there are two or more insurers on the same policy, they are not all meant to keep a reserve. This is how the state administrative practice operates. As long as someone has the reserve, this is sufficient.

■ Under Treaty II plaintiff reinsured with American Bankers. This was authorized under Code of Georgia Annotated § 56–413.[5] Section 56–906(2) [6] pro-

---

**3.** § 20–505. *Liabilities*

"In any determination of the financial condition of an insurer, capital stock and liabilities to be charged against its assets shall include:

\* \* \* \* \* \*

"3. With reference to life and disability insurance and annuity contracts:

\* \* \* \* \* \*

"(b) Reserves for disability benefits, for both active and disabled lives,

\* \* \* \* \*

"(d) Any additional reserves which may be required by the director consistent with practice formulated or approved by the national association of insurance commissioners, on account of such insurance.

"4. With reference to insurance other than specified in paragraph 3 of this section, and other than title insurance, the amount of reserves equal to the unearned portions of the gross premiums charged on policies in force, computed in accordance with this article."

\* \* \* \* \* \*

**4.** § 20–506. *Unearned premium reserve*

"A. With reference to insurance against loss or damage to property, except as provided in § 20–507, and with reference to all general casualty insurance, disability insurance, except as provided in §§ 20–508 and 20–510, and surety insurance, every insurer shall maintain an unearned premium reserve on all policies in force."

**5.** § 56–413. *Authorized reinsurance.*—"(1) An insurer shall reinsure its risks, or any part thereof, only in solvent insurers having surplus to policyholders or trusteed funds on deposit in the United States for the benefit of their policyholders not less in amount than the paid-in capital required under this Title of a domestic stock insurer authorized to transact like kinds of insurance.

"(2) An insurer shall so reinsure in such alien insurers only as either (a) are authorized to transact insurance in at least one state of the United States, or (b) have in the United States a duly authorized attorney-in-fact to accept service of legal process against the insurer as to any liability which might arise on account of such reinsurance, or (c) may be approved by the Commissioner. In the event reinsurance is placed which is not in compliance with the foregoing provisions, the ceding insurer shall not be allowed credit for such reinsurance either as an asset or deduction from liability, nor may it increase any amounts it is authorized to have at risk because of such reinsurance.

"(3) No credit shall be allowed, as an asset or as a deduction from liability, to any ceding insurer for reinsurance nor increase the amount it is authorized to have at risk unless the reinsurance is in insurers either authorized to do business in this State, or which have been approved by written order of the Department filed in its office and which order has not been subsequently disapproved; Provided, however, that such credit shall be allowed for reinsurance ceded to unauthorized alien assuming insurers, if such insurers have maintained in the United States for not less than 10 years immediately preceding such reinsurance a trust fund of not less than $50,000,000 available for the purpose of protecting policyholders in the United States. Nor shall such credit be allowed unless the reinsurance is payable by the assuming insurer on the basis of the liability of the ceding insurer under the contracts reinsured without diminution because of the insolvency of the ceding insurer.

\* \* \* \* \* \*

"(5) Notwithstanding the provisions of this Code, full credit shall be allowed a ceding insurer, as an asset or as a deduction from liability, for all reinsurance which may be in effect or which may be hereafter effected under any contract or reinsurance in effect on the 31st day of December 1959, and any continuations or renewals of such contract of reinsurance. Provided, however, that no new insurance risk shall be ceded after two years from the effective date of this Title unless such reinsurance contract meets all the standards set forth in this Title."

**6.** § 56–906.

"(2) The Commissioner may require that such reserves shall be equal to the unearned portions of the gross premiums in force after

vides for a deduction of reinsurance from gross premiums before computing the unearned premium reserve. Arizona Revised Statutes Annotated § 20–261[7] and § 20–506B[8] are similar. Defendant argues that Treaty II is a Surplus Aid contract in that since plaintiff did not reinsure its risks despite the formalities, the treaty did not qualify as authorized reinsurance and plaintiff could not take credit for the reserves. In answer to this, it can only be said that plaintiff did reinsure its risk. American Bankers was responsible for the risk and even though it only kept 3 percent of the premiums, in the event that losses had eaten into the 3 percent, this would have been American Bankers' loss, not plaintiff's.

Defendant then argues that even if Treaty II is operative, plaintiff would have to re-establish the reserve as an offsetting liability to the asset required under paragraph 8 of § 20–501 of the Arizona law. That section is directed primarily toward loss reimbursements for losses paid directly by the ceding company. Therefore, there is no asset belonging to plaintiff because plaintiff does not have an enforceable claim of right against American Bankers.

■■■ We observe that the Arizona Code relating to insurance companies provided under § 20–152 for the director of insurance to certify the facts of violation of any provision to the attorney general for enjoining the violation. We also observe that the Georgia Code relating to insurance companies provided under § 56–214 that the Commissioner may institute legal proceedings for the enforcement of any provisions of the act. For the years in question, none of these actions were taken by either of the state officers in charge. With relation to doubtful or ambiguous statutes, it is generally accepted that in the absence of a court decision, the interpretation placed thereon by the regulatory body charged with enforcement thereof is compelling authority. Federal courts have applied this rule to state administrative interpretations or actions under state statutes. We believe that the language of the court in *Salt Lake County v. Kennecott Copper Corp.*, 163 F.2d 484, 489 (10th Cir. 1947) *cert. denied*, 333 U.S.

---

deducting reinsurance in solvent insurers as computed on each respective risk from the policy's date of issue. If the Commissioner does not so require, the portions of the gross premium in force, less reinsurance in solvent insurers to be held as a premium reserve, shall be computed according to the following table:"

     *    *    *    *    *    *

7.  § 20–261. *Authorized reinsurance*

   "A. An insurer shall reinsure its risks, or any part thereof, only in solvent insurers having surplus to policyholders not less in amount than the paid-in capital required under this title of a domestic stock insurer, other than a limited stock insurer, authorized to transact like kinds of insurance. A domestic limited stock life insurer may accept reinsurance of the risks of other such limited stock insurers and of domestic benefit insurers.

   "B. An insurer shall so reinsure in such alien insurers only as either are authorized to transact insurance in at least one state of the United States, or have in the United States a duly authorized attorney-in-fact to accept service of legal process against the insurer as to any liability which might arise on account of such reinsurance.

"C. No credit shall be allowed, as an asset or as a deduction from liability, to any ceding insurer for reinsurance unless the reinsurance is payable by the assuming insurer on the basis of the liability of the ceding insurer under the contracts reinsured without diminution because of the insolvency of the ceding insurer nor unless under the reinsurance contract the liability for such reinsurance is assumed by the assuming insurer or insurers as of the same effective date."

     *    *    *    *    *    *

8.  § 20–506.

   "B. The director may require that such reserves be equal to the unearned portions of the gross premiums in force after deducting reinsurance in solvent insurers as computed on each respective risk from the policy's date of issue. If the director does not so require, the portions of the gross premiums in force, less reinsurance in solvent insurers to be held as a premium reserve, shall be computed according to the following table:"

     *    *    *    *    *    *

832, 68 S.Ct. 458, 459, 92 L.Ed. 1116, adopting a state administrative interpretation of an ambiguous state statute, is pertinent herein:

\* \* \* Both the Supreme Court of Utah and this court are firmly committed to the familiar principle of law that in the interpretation of a doubtful or ambiguous statute, the long-continued and uniform interpretation of the administrative agency or authority charged with its administration is entitled to great weight and will not be overturned, except for cogent reasons. An administrative interpretation does not avail to overcome a statute which is so plain in its commands that it leaves nothing for construction; but ordinarily in case of doubt or ambiguity, it is entitled to great weight and will not be overthrown, except for cogent reasons. *State Board of Land Commissioners v. Ririe*, 56 Utah 213, 190 P. 59; *Utah Hotel Co. v. Industrial Commission*, 107 Utah 24, 151 P.2d 467, 153 A.L.R. 1176; *Utah Power & Light Co. v. Public Service Commission*, 107 Utah 155, 152 P.2d 542; *E. C. Olsen Co. v. State Tax Commission* [109 Utah 563], 168 P.2d 324; *Baze v. Scott*, 10 Cir., 106 F.2d 365; *United States v. Magnolia Petroleum Co.*, 10 Cir., 110 F.2d 212; *Standard Surety & Casualty Co. v. State of Oklahoma*, 10 Cir., 145 F.2d 605. \* \*

We believe that the Court's language in *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), explains the basic reason for the rule and we deem it appropriate in the present case:

There is no statutory provision as to what, if any, deference courts should pay to the Administrator's conclusions. And, while we have given them notice, we have had no occasion to try to prescribe their influence. The rulings of this Administrator are not reached as a result of hearing adversary proceedings in which he finds facts from evidence and reaches conclusions of law from findings of fact. They are not, of course, conclusive, even in the cases with which they directly deal, much less in those to which they apply only by analogy. They do not constitute an interpretation of the Act or a standard for judging factual situations which binds a district court's processes, as an authoritative pronouncement of a higher court might do. *But the Administrator's policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case. They do determine the policy which will guide applications for enforcement by injunction on behalf of the Government. Good administration of the Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only where justified by very good reasons.* The fact that the Administrator's policies and standards are not reached by trial in adversary form does not mean that they are not entitled to respect. This Court has long given considerable and in some cases decisive weight to Treasury Decisions and to interpretative regulations of the Treasury and of other bodies that were not of adversary origin. [Emphasis supplied.]

We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

See *New York State Department of Social Services v. Dublino*, 413 U.S. 405,

420–421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *NLRB v. Boeing Co.,* 412 U.S. 67, 74–75, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973); *CBS v. Democratic National Committee,* 412 U.S. 94, 121, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Travelers Indemnity Co. v. Wells,* 316 F.2d 770, 773 (4th Cir. 1963); *Barrington Manor Apartments Corp. v. United States,* 459 F.2d 499, 502–503, 198 Ct.Cl. 298, 304 (1972); *Alabama v. United States,* 461 F.2d 1324, 1329–30, 198 Ct.Cl. 683, 692, *cert. denied,* 409 U.S. 1023, 93 S.Ct. 464, 34 L.Ed.2d 315 (1972); *Inter-City Truck Lines, Ltd. v. United States,* 408 F.2d 686, 688, 187 Ct.Cl. 290, 295 (1969); *Cornman v. United States,* 409 F.2d 230, 233, 187 Ct.Cl. 486, 492, *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 424 (1969); *DeLano v. United States,* 393 F.2d 517, 521, 183 Ct.Cl. 379, 388 (1968); *Ganse v. United States,* 376 F.2d 900, 904, 180 Ct.Cl. 183, 189 (1967); *Citizen Band of Potawatomi Indians v. United States,* 391 F.2d 614, 621, 179 Ct.Cl. 473, 486–487 (1967), *cert. denied,* 389 U.S. 1046, 390 U.S. 957, 88 S.Ct. 771, 1046, 19 L.Ed.2d 839, 1152 (1968); *Crawford v. United States,* 376 F.2d 266, 274–275, 179 Ct.Cl. 128, 142–143 (1967), *cert. denied,* 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968); *cf. Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 U.S. 726, 745, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *Love v. Fitzharris,* 460 F.2d 382, 385 (9th Cir. 1972), *vacated,* 409 U.S. 1100, 93 S.Ct. 896, 34 L.Ed.2d 682 (1973).

Finally, with relation to the testimony of Mr. Sturtevant, who testified that the unearned premium reserve as reported by American Bankers and plaintiff was permitted "unwittingly" by the Georgia insurance authorities, we have reviewed his testimony and it does not change our interpretation of the Georgia law above expressed.

For the foregoing reasons, we hold that the plaintiff is entitled to recover.

NICHOLS, Judge (dissenting):

The dissent in *Penn Security Life Insurance Company v. United States,* Ct. Cl., 524 F.2d 1155 announced this date is to be deemed as being applicable to this case.

**DEL MAR ENGINEERING LABORATORIES**

v.

**The UNITED STATES.**

**No. 27–71.**

United States Court of Claims.

Oct. 22, 1975.

