**WESTERN DIVERSIFIED LIFE INSURANCE COMPANY**

v.

**The UNITED STATES.**

**No. 99–75.**

United States Court of Claims.

Dec. 2, 1981.

John L. Snyder, Chicago, Ill., atty. of record, for plaintiff. Michael M. Conway and Hopkins & Sutter, Chicago, Ill., of counsel.

Michael J. Dennis, Washington, D. C., with whom was Acting Asst. Atty. Gen. John F. Murray, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert C. Markham, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and BENNETT and SMITH, Judges.

## OPINION

### PER CURIAM:

This suit for refund of federal income taxes comes before the court on defendant's exceptions to the recommended decision (including an opinion, findings of fact, and conclusion of law), filed by Trial Judge Mastin G. White, pursuant to Rule 134(h). We had previously heard argument on cross-motions for partial summary judgment after which we issued our order of June 29, 1979, denying said motions and remanding for further proceedings.

In the order of remand the court noted the conflicting views contained in the affidavits of expert witnesses submitted for the purpose of defining whether certain insurance reserves were "required by law" pursuant to interpretations and application of the pertinent statutes of the State of Arizona. We remanded in order that the evaluation of the conflicting views of these experts and the weight to which they were entitled could be evaluated after trial and after exposure to cross-examination. Pursuant to our order the trial judge conducted a trial at which the evidence taken included considerable conflicting testimony and documentary evidence on that specific issue. We have again heard oral argument and have considered the Government's exceptions and the briefs of the parties, as well as the record as a whole. While we would have preferred that the trial judge provided more discussion of his consideration of that issue, we nevertheless agree with the result. Since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* with minor revision, as the basis for its judgment in this case, plaintiff is entitled to recover with judgment entered for plaintiff, with the amount of recovery to be determined pursuant to Rule 131(c), as set forth in the conclusion of law.

### OPINION OF TRIAL JUDGE

WHITE, *Senior Trial Judge*: The petition in this case was filed by Coronado Life Insurance Company ("Coronado"), as successor to Ram Life Insurance Company ("Ram"). Subsequently, while the court proceedings were in progress, Coronado changed its name to Western Diversified Life Insurance Company ("Western Diversified"), and the latter was substituted for Coronado as the party plaintiff.

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

In the petition, as amended, Coronado (now Western Diversified) claimed, first, that Ram, in its federal income tax returns for the taxable years 1970, 1971, and 1972, had made errors to its disadvantage with respect to income and deductions; and, accordingly, that Ram had overpaid its income taxes for the 3 years in the respective amounts of $2,960.99, $13,937.00, and $6,239.28. During the course of the pretrial proceedings, however, the plaintiff conceded that it is not entitled to any refund in connection with this aspect of the case.

Coronado also contended in the petition, as amended: that the Internal Revenue Service improperly assessed deficiencies against Ram for the taxable years 1970, 1971, and 1972 in the respective amounts of $9,420.77, $29,793.86, and $59,163.94 on the basis of an erroneous determination that Ram was not a life insurance company for income tax purposes, within the meaning of section 801 of the Internal Revenue Code of 1954 ("the 1954 Code"); that Coronado (as successor to Ram) had paid the asserted deficiencies, plus interest thereon; and, therefore, that Coronado was entitled to recover the amounts so paid, totaling $117,-917.27 for the 3 years, together with statutory interest. This aspect of the case was not disposed of in the pretrial proceedings, or otherwise.

### The Issues

The question of whether Ram did or did not qualify for income tax treatment as a life insurance company under section 801 of the 1954 Code was presented to the court by the parties at an earlier stage of the case, through the filing of cross-motions for partial summary judgment. Upon considering the cross-motions, and the affidavits of experts which the parties submitted in support of their respective motions, the court concluded in an order dated June 29, 1979, that "[i]n view of the complexities of the issues and the sharp conflicts among the experts, this case is not suitable for disposition on summary judgment." Accordingly, the cross-motions for summary judgment were denied, and the case was remanded to the trial division for further proceedings.

Thereafter, trial sessions were held in Austin, Texas, in Phoenix, Arizona, and in Washington, D. C., during the spring and summer of 1980. A rather extensive trial record, consisting of both factual evidence and expert testimony, was assembled at these sessions.

Section 801(a) of the 1954 Code (26 U.S.C. § 801(a) (1976)) provides that in order to qualify for income tax treatment as a life insurance company, an insurance company's life insurance reserves (plus unearned premiums and unpaid losses on non-cancellable life, health, or accident policies not included in life insurance reserves) must comprise more than 50 percent of the company's total reserves. The fundamental question in the present case is whether Ram met this "more than 50 percent" test during the 1970, 1971, and 1972 taxable years.

The basic question stated in the preceding paragraph can be subdivided into two subsidiary questions, as follows:

(1) Did Ram act properly in establishing and maintaining a life insurance reserve in connection with its operations?

(2) Did Ram act properly in failing to establish and maintain an unearned premium reserve in connection with its operations?

If *both* of the numbered subsidiary questions are answered in the affirmative, the plaintiff will be entitled to recover in the present litigation.

On the other hand, if *either* of these questions is answered in the negative, the plaintiff will not be entitled to recover.

### Ram

Ram was incorporated as a stock life insurance company under the laws of the State of Arizona on September 10, 1969, and commenced business on January 1, 1970. Arizona was the only State in which Ram was licensed to transact an insurance business.

The State of Arizona provides by statute for the creation of so-called limited capital (or "mini-cap") insurance companies. Dur-

ing the period in issue here, these companies could be established with a minimum capital of $25,000 (which had to be kept on deposit with the State Treasurer of Arizona) and a minimum surplus of $12,500 (which was available for the conduct of business). Ram was such a limited capital Arizona insurance company.

During the taxable years 1970, 1971, and 1972 (*i.e.*, the period involved in the present litigation), Ram's sole business was that of reinsuring risks under credit life insurance policies and credit disability insurance policies written by Gulf Atlantic Insurance Company ("Gulf Atlantic"), a Texas stock life insurance company.

Credit life insurance usually is purchased by a person incurring an installment debt obligation (*e.g.*, in connection with the purchase of an automobile). In a credit life insurance policy, the insurance company insures the creditor against the risk of the debtor's death during the term of the policy, which is coterminous with the duration of the installment credit obligation. As installments become due and are paid by the debtor during the existence of the insurance contract, the amount of the insurance coverage normally declines, so as to be equal at all times to the outstanding balance due on the consumer debt. The beneficiary of the declining balance under a credit life insurance policy is the insured's creditor. In the event of the debtor's death during the existence of the policy, the proceeds from the policy are paid to the creditor in whatever amount is still owing on the consumer debt obligation.

Credit disability insurance (sometimes referred to as credit accident and health or "A&H" insurance) is also purchased by a person incurring an installment debt obligation. Such a policy insures the creditor against the risk of the debtor becoming disabled while the indebtedness is outstanding. If the insured becomes disabled, the insurance company pays the creditor the monthly installments due on the indebtedness until the insured person recovers, or until the obligation is paid in full.

The insurance company writing a credit insurance policy (whether credit life insurance or credit disability insurance) usually collects from the insured at the outset a single premium for the coverage during the entire term of the policy.

The insurance company issuing a credit insurance policy is known as the "direct writing company." The direct writing company may reinsure part (or all) of the risk under such a policy with another insurance company that is willing to accept the risk. If such an arrangement is entered into, the agreement between the two companies is commonly referred to in the insurance industry as a reinsurance "treaty," the direct writing company which reinsures the risk is called the "ceding company," and the company which agrees to accept the risk is called the "assuming company."

Our case involves a reinsurance arrangement in which Gulf Atlantic was the ceding company and Ram was the assuming company. The agreement between the two companies was incorporated in a document entitled Automatic Reinsurance Treaty ("the reinsurance treaty" or "the treaty").

*The Treaty*

The treaty was entered into between Gulf Atlantic and Ram on August 18, 1969; it became effective on January 2, 1970; and it continued in effect throughout the years (1970–72) involved in the present litigation, and until June 4, 1974, when Ram was merged into Coronado and Ram's Arizona charter was canceled.

In accordance with the treaty, Gulf Atlantic ceded, and Ram accepted and reinsured, 100 percent of the risk under each credit life insurance policy and each credit disability policy issued by Gulf Atlantic in connection with installment credit transactions entered into by a number of specified companies (except that if a credit life policy was for an amount in excess of $3,000, or if a credit disability policy was for an amount in excess of $5,000, Gulf Atlantic retained the risk as to the excess amount).

Gulf Atlantic agreed in the treaty to pay Ram a reinsurance premium equal to 100

percent of the net written life insurance premiums, and 100 percent of the net earned disability premiums, received by Gulf Atlantic under the reinsured policies. Ram, in turn, agreed to pay back to Gulf Atlantic 6 percent (later changed to 5 percent) of the net ceded reinsurance premium and to reimburse Gulf Atlantic for commissions paid to agents, for premium taxes incurred by Gulf Atlantic, and for the amount of losses incurred by Gulf Atlantic under the policies. The accounts between the two companies were to be balanced on a monthly basis.

The net written life insurance premiums which Gulf Atlantic was to pay Ram on a monthly basis consisted of all the life insurance premiums collected by Gulf Atlantic during a particular month under credit life policies covered by the treaty, less any refunds of premiums made by Gulf Atlantic during the month on such policies that had been cancelled. The net earned disability premiums which Gulf Atlantic was to pay Ram on a monthly basis consisted of all the premiums earned during the month under credit disability policies. (As will be more fully explained later, the premium on a credit disability policy is earned from month to month, with the passage of time.) If the total of the sums which were payable by Gulf Atlantic to Ram for a particular month exceeded the total of the sums which Ram was to pay to Gulf Atlantic for the month (i.e., the specified percentage of the reinsurance premium, reimbursement for commissions paid to agents, reimbursement for premium taxes incurred by Gulf Atlantic, and reimbursement for losses incurred by Gulf Atlantic), the amount of such excess was paid by Gulf Atlantic to Ram. On the other hand, if the total of the sums payable by Ram to Gulf Atlantic for a particular month exceeded the total of the sums that were payable by Gulf Atlantic to Ram for the month, Ram paid the amount of the excess to Gulf Atlantic.

### The Life Insurance Reserve Problem

■ The State of Texas requires an insurance company writing life insurance policies in that State to establish a life insurance reserve in connection with the issuance of such policies. This requirement is imposed so that there will be sufficient assets, matching the reserve, to pay claims if and when they arise in the future under the policies. Consequently, when Gulf Atlantic wrote a credit life insurance policy during the period covered by the treaty, it added to its life insurance reserve an appropriate amount (determined on an actuarial basis) with respect to such policy.

It has been mentioned previously in the opinion that Gulf Atlantic was required by the treaty to pay to Ram, on a monthly basis, the entire net life insurance premiums that were collected by Gulf Atlantic under the credit life policies covered by the reinsurance treaty. Ram, in turn, established and maintained a life insurance reserve with respect to all such policies, the amount of the reserve being determined in accordance with actuarial principles. The purpose of the reserve was to make sure that Ram would have sufficient assets, matching the reserve, to reimburse Gulf Atlantic for any losses that might be incurred under the credit life policies covered by the treaty.

Gulf Atlantic took a corresponding reserve credit by reducing its life insurance reserve in an amount equal to the amount which it had previously added to its reserve for the particular policies when they were written, and equal to the amount of the reserve established by Ram for such policies. Thus, while the reinsurance treaty was in existence, the life insurance reserve for the credit life policies covered by the treaty was carried by Ram, and not by Gulf Atlantic.

As required by the laws of Arizona and Texas during the taxable years in issue, Ram and Gulf Atlantic each filed annually with the insurance department of the State in which it was domiciled an annual statement prepared on the form prescribed by the National Association of Insurance Commissioners ("NAIC"); and each company also filed a copy of its annual statement with the Internal Revenue Service, along

with the company's federal income tax return for the particular year.

The annual statement is a detailed disclosure of an insurance company's activities for the particular year, and provides complete information concerning the company's assets, liabilities, and income. The officers of the company swear under oath to the truthfulness of the information contained in the company's annual statement.

The annual statements filed by Ram and Gulf Atlantic for the years in issue with the insurance departments of Arizona and Texas, respectively,[1] disclosed the operations of these companies under the treaty and revealed that Ram was carrying—and that Gulf Atlantic was not carrying—the life insurance reserve with respect to the credit life policies covered by the treaty. The record indicates that the Arizona Insurance Department did not raise any objection to this treatment of the life insurance reserve by Ram, but that an examiner of the Texas Insurance Department, in connection with a triennial examination of Gulf Atlantic in 1971, did raise a question concerning the propriety of Gulf Atlantic's action in taking reserve credit with respect to the credit life policies reinsured with Ram under the treaty.

The Texas Insurance Department examines on a regular basis the insurance companies that are domiciled in Texas, and these examinations are called "triennial" examinations (although such examinations often cover periods other than 3 years). On two occasions, Gulf Atlantic was subjected to triennial examinations by the Texas Insurance Department that involved portions of the period with which the court is concerned in the present litigation. Both examination reports considered the transactions undertaken between Gulf Atlantic and Ram pursuant to the reinsurance treaty.

The first triennial examination of Gulf Atlantic covering part of the period involved here was conducted in 1971, and it covered Ram's operations through December 31, 1970. (The year 1970 was the first of the 3 years involved in this case.) This was a so-called zone examination, in which examiners from States other than Texas also participated.

During the course of the examination of Gulf Atlantic in 1971, the Texas Insurance Department examiner noted that Gulf Atlantic had entered into reinsurance agreements with eight Arizona limited capital insurance companies, including Ram, which were not licensed to do business in Texas, and that Gulf Atlantic had taken reserve credit by reducing its life insurance reserve by amounts equivalent to the amounts of the life insurance reserves maintained by the Arizona companies with respect to the credit life policies reinsured under the respective reinsurance agreements. The examiner was of the opinion that inasmuch as the Arizona limited liability companies were not licensed to do business in Texas, it was not proper for Gulf Atlantic to take reserve credit by reducing its life insurance reserve, unless Gulf Atlantic required the Arizona companies to establish and maintain with Gulf Atlantic deposits in amounts equivalent to the reserve credit taken by Gulf Atlantic.

The examiner's views, as indicated in the preceding paragraph, were orally communicated to Gulf Atlantic. Thereafter, while the examination was still in progress, Gulf Atlantic and Ram entered into an addendum to the treaty, and the addendum was made effective retroactively as of August 18, 1969 (*i.e.*, the original date of the treaty).

Under the treaty addendum, Ram agreed to—and did—establish and thereafter maintain a deposit with Gulf Atlantic in an amount equal at all times to the reserve credit which Gulf Atlantic had taken in connection with the credit life policies reinsured with Ram. The addendum stated in this connection that the deposit was to be held "in trust" by Gulf Atlantic "for the mutual benefit" of Gulf Atlantic and Ram.

1. Gulf Atlantic was licensed to do business in Arizona; and it also filed a copy of each annual statement with the Arizona Insurance Department.

In his report of the examination of Gulf Atlantic for the period which ended December 31, 1970, the Texas Insurance Department examiner noted that the treaty had been supplemented by the addendum during the course of the examination, and that Ram had agreed to maintain with Gulf Atlantic a deposit in an amount equal to the life insurance reserve which Gulf Atlantic "would otherwise be required to maintain." On the basis of the treaty addendum, the examiner did not require Gulf Atlantic to make any adjustment upward in its life insurance reserve because of the reserve credit previously taken with respect to the credit life policies reinsured with Ram.

On the other hand, some of the Arizona limited liability insurance companies with which Gulf Atlantic had entered into reinsurance agreements covering credit life policies did not deposit with Gulf Atlantic assets equivalent to the life insurance reserves on the credit life policies which they had reinsured for Gulf Atlantic, and the Texas Insurance Department examiner required Gulf Atlantic to make an appropriate increase in its life insurance reserve with respect to such policies.

Gulf Atlantic and Ram entered into the treaty addendum on the basis of the Texas Insurance Department examiner's view, expressed during the course of the triennial examination of Gulf Atlantic in 1971, that this would eliminate any question concerning the propriety of Gulf Atlantic's action in taking reserve credit for the life insurance reserve established and maintained by Ram with respect to the credit life policies reinsured by Ram under the treaty.

Gulf Atlantic was subsequently examined by the Texas Insurance Department for the 4-year period that began January 1, 1971, and ended December 31, 1974. This period included 2 years (1971 and 1972) that are involved in the present litigation. In his report of the 1971–74 examination, the Texas Insurance Department examiner noted the existence of the reinsurance agreement between Gulf Atlantic and Ram, and that Ram was maintaining a deposit with Gulf Atlantic to offset the reserve credit taken by Gulf Atlantic with respect to the credit life policies reinsured with Ram. The examiner did not question the propriety of Gulf Atlantic's action in taking reserve credit under such circumstances.

After preparing the reports of the respective triennial examinations of Gulf Atlantic for the periods previously mentioned, the Texas Insurance Department examiner submitted the reports to the Examination Division of the Texas Insurance Department for review. The Examination Division, in its review, did not take any exception to the portions of the reports dealing with Gulf Atlantic's operations under the reinsurance treaty with Ram, including Gulf Atlantic's action in taking reserve credit on the basis of the deposit maintained by Ram with Gulf Atlantic under the treaty addendum.

In discussing the life insurance reserve problem in their briefs, the parties have devoted much of their attention to the question of whether Gulf Atlantic acted properly (as the Texas Insurance Department's examiner and Examination Division concluded, and as the plaintiff contends in the present litigation) or improperly (as the defendant contends) in taking reserve credit on the basis of the equivalent deposit which Ram maintained with Gulf Atlantic under the treaty addendum. In this connection, article 3.10 of the Texas Civil Statutes Annotated, Insurance Code, expressly states in part that "no credit for the reserve liability on * * * reinsurance may be taken by the ceding [Texas] company unless the assuming insurer is licensed to do business in this state * * *." As previously stated, Ram was not licensed to do business in Texas.

It seems unnecessary, however, for the court to decide whether Gulf Atlantic acted properly or improperly in taking reserve credit with respect to the credit life policies reinsured with Ram. Gulf Atlantic is not a claimant in the present case; and the court is not concerned with the ratio existing between Gulf Atlantic's life insurance reserve and its other reserves during the period involved in the present litigation. The question of whether or not, under Texas

law, Gulf Atlantic maintained a proper life insurance reserve during the period in question was for the consideration of, and determination by, the Texas authorities; and they, as previously indicated, did not require any corrective action.

The only plaintiff in this case is Western Diversified, as the successor to Ram through Coronado. Attention, therefore, must be centered on the question of whether Ram acted properly or improperly in establishing and maintaining a life insurance reserve with respect to the credit life policies which it reinsured for Gulf Atlantic.

It appears that, irrespective of what Gulf Atlantic did or should have done under the circumstances, the Arizona Insurance Department was justified in accepting, without objection, Ram's annual statements, which disclosed that Ram was maintaining the life insurance reserve with respect to the credit life policies which Ram reinsured for Gulf Atlantic under the treaty. Section 20–505 of the Arizona Revised Statutes provided in part as follows during the 1970–72 period:

> In any determination of the financial condition of an insurer, capital stock and liabilities to be charged against its assets shall include:
>
> \* \* \* \* \* \*
>
> 3. With reference to life and disability insurance and annuity contracts:
>
> (a) The amount of reserves on life insurance policies and annuity contracts in force, valued according to the tables of mortality, rates of interest, and methods adopted pursuant to this title which are applicable thereto.
>
> \* \* \* \* \* \*
>
> (d) Any additional reserves which may be required by the director consistent with practice formulated or approved by the national association of insurance commissioners, on account of such insurance.

The credit life insurance policies which Ram reinsured for Gulf Atlantic under the treaty were, of course, "life insurance policies \* \* \* in force," for which Ram had assumed 100 percent of the risk of loss. It seems, therefore, that section 20–505 of the Arizona Revised Statutes required Ram to establish and maintain a life insurance reserve with respect to such policies.

The defendant argues in its brief, however that under the Arizona statutory provision previously quoted, an insurance company must have assets against which to charge any life insurance reserve (which is a liability from an accounting standpoint); and that Ram did not have any assets against which it could properly charge a life insurance reserve. In this connection, however, section 20–501 of the Arizona Revised Statutes, which defines the items which may be considered as assets of an insurance company, includes in subsection 9 "[a]mounts receivable by an assuming insurer representing funds withheld by a solvent ceding insurer under a reinsurance treaty."

The deposit which Ram maintained with Gulf Atlantic under the treaty addendum was an amount "receivable by an assuming insurer [Ram]" and represented funds "withheld by a solvent ceding insurer [Gulf Atlantic] under a reinsurance treaty." This receivable was in an amount equal to, and sufficient to offset, the life insurance reserve which Ram maintained with respect to the credit life policies reinsured by Ram under the reinsurance treaty.

The deposit was Ram's asset because it represented funds which belonged to Ram originally and which Ram turned over for Gulf Atlantic to hold "in trust" against the possibility that Ram, during the existence of the reinsurance treaty, might become insolvent or otherwise fail to discharge its financial obligations to Gulf Atlantic relative to the credit life policies covered by the reinsurance treaty. Gulf Atlantic was never entitled to use any part of the deposit, because the contingency for which the deposit was held "in trust" never materialized during the existence of the reinsurance treaty; and Gulf Atlantic reported the amount of the deposit as a liability on its annual statements.

The treaty addendum stated that the deposit was to be held "in trust" by Gulf Atlantic "for the mutual benefit" of Gulf Atlantic and Ram. It was for the benefit of Gulf Atlantic because it protected that company against the possibility that Ram might become insolvent or otherwise fail to discharge its obligations to Gulf Atlantic under the reinsurance treaty. The deposit was for the benefit of Ram because it would ultimately revert to Ram upon the termination of the treaty if Ram met its commitments under the treaty, and it would also be returned to Ram at any time if Ram applied for and obtained a license to conduct a life insurance business in Texas.

The deposit which Ram maintained with Gulf Atlantic under the treaty addendum was analogous to the assets representing Ram's capital which Ram was required to maintain on deposit with the State Treasurer of Arizona. Such assets were assets of Ram, and not assets of the State of Arizona. Similarly, the deposit which Ram maintained with Gulf Atlantic, and which Gulf Atlantic held "in trust" pending the termination of the treaty, was an asset of Ram's, and not Gulf Atlantic's asset.

Perhaps it should be mentioned in this connection that the deposit which Ram maintained with Gulf Atlantic under the treaty addendum was not involved in the monthly settlement of accounts between Gulf Atlantic and Ram. The monthly settlements of accounts covered all operations under the reinsurance treaty during the particular month; it involved the credit disability policies as well as the credit life policies; and it resulted in a net payment by Gulf Atlantic to Ram, or vice versa. The deposit related only to the credit life policies; and, as previously stated, no part of the deposit was ever available to Gulf Atlantic for use because the contingency for which it was held "in trust" by Gulf Atlantic never materialized during the existence of the reinsurance treaty. Thus, the deposit at all times constituted an asset of Ram's, against which Ram could properly charge the life insurance reserve which it established and maintained in connection with the credit life policies reinsured by Ram under the treaty.

It must be concluded, therefore, that Ram acted properly, and as required by Arizona law, in establishing and maintaining a life insurance reserve with respect to the credit life policies which it reinsured for Gulf Atlantic under the reinsurance treaty.

This conclusion disposes of an argument made by the defendant that the reinsurance treaty in this case, as supplemented by the treaty addendum, constituted modified coinsurance. The chief characteristic of modified coinsurance is that the life reserve with respect to the reinsured policies is held by the ceding company (NAIC's "Financial Condition Examiners Handbook," part 5, sec. II, par. 8–B–1–a). This excludes a coinsurance agreement, such as the one involved in the present case, where the assuming company (irrespective of what the ceding company does or fails to do) is required by the law of the State in which it is domiciled to maintain a life reserve for the reinsured policies.

### The Unearned Premium Reserve Problem

■ It has been stated previously in the opinion that credit disability policies, as well as credit life policies, were reinsured by Ram for Gulf Atlantic under the treaty; that Gulf Atlantic, as the direct writing company, normally collected the premium on each credit disability policy in a lump sum at the outset for the entire period of the coverage; and that, under the terms of the treaty, Gulf Atlantic was required to pay to Ram, on a monthly basis, 100 percent of the disability premiums *earned* during the month.

When credit disability insurance policies are issued in Texas by a company licensed to do business in that State and premiums are received, the direct writing company is required by the Texas insurance laws to set up a reserve for the protection of the policyholders, in order that sufficient assets, matching the reserve, will be available to pay claims that may arise later under the policy.

The premium received upon the issuance of a credit disability policy is earned on a

monthly basis with the passage of time during the existence of the policy; and as portions of the premium are thus earned, the premium reserve is correspondingly reduced. However, the reserve must still be maintained with respect to the portions of the premium not yet earned; and this reserve is commonly referred to as the "unearned premium reserve."

In connection with the credit disability policies reinsured by Ram under the treaty, Gulf Atlantic collected the premiums upon issuing the policies, and then transferred to Ram those portions—and only those portions—of the premiums that were earned from month to month. Gulf Atlantic and Ram agreed in the treaty that the computation of earned premiums would be made in accordance with the "Rule of 78." This rule provides that on a 12-month credit disability policy, for example, $12/78$ths of the total premium will be earned during the first month, $11/78$ths will be earned during the second month, and so on, with $1/78$th being earned during the twelfth and last month.

As the premiums on the credit disability policies covered by the treaty were transferred by Gulf Atlantic to Ram on a when-earned basis only, Gulf Atlantic at all times maintained the unearned premium reserve with respect to such policies, and Ram did not at any time maintain an unearned premium reserve in connection with these policies.

The annual statements which Ram filed with the Arizona State Insurance Department for the period in question, and the annual statements which Gulf Atlantic filed with the Texas State Insurance Department (and also with the Arizona State Insurance Department), all disclosed that Gulf Atlantic was maintaining—and Ram was not maintaining—the unearned premium reserve with respect to the credit disability policies covered by the treaty. Neither the Arizona Insurance Department nor the Texas Insurance Department interposed any objection to the manner in which the two companies were handling the matter of the unearned premium reserve.

It might also be mentioned in this connection that the reports on the two triennial examinations of Gulf Atlantic previously mentioned in this opinion did not require any adjustment of the unearned premium reserve which Gulf Atlantic was maintaining with respect to the credit disability policies covered by the treaty with Ram, or suggest that Ram, rather than Gulf Atlantic, should establish and maintain the unearned premium reserve in connection with such policies.

During the period when Ram filed its annual statements for the years 1970, 1971, and 1972 (*i.e.*, the years involved in the present litigation) with the Arizona Insurance Department, the then Chief Examiner of that department, in the performance of his official duties, construed the Arizona insurance laws as meaning that when an Arizona limited liability insurance company reinsured credit disability policies written by a company domiciled in another State and received the premiums on a when-earned basis only, the Arizona assuming company was not required to establish and maintain an unearned premium reserve with respect to the unearned portions of the premiums. The Chief Examiner orally advised other examiners of his views concerning this matter. Although at least one examiner in the Arizona Insurance Department at the time [2] interpreted the requirements of the Arizona insurance laws differently, it appears that, at the time involved here and until the end of 1978, Arizona limited liability companies which reinsured credit disability policies written by companies domiciled elsewhere, and which received the premiums on a when-earned basis only, generally did not maintain—and were not required by the Arizona Insurance Department to maintain—an unearned premium reserve with respect to the unearned portions of the premiums.

In 1978, the then Director of Insurance for the State of Arizona was aware of the rather general practice whereby Arizona limited capital companies which reinsured

---

2. This examiner later became the Chief Examiner.

credit disability policies written by companies domiciled elsewhere, and which received the premiums on a when-earned basis only, were not maintaining—and were not being required by the Arizona State Insurance Department to maintain—an unearned premium reserve in connection with the unearned portions of the premiums. After holding a public hearing on the matter, the Director of Insurance, with the approval of the Attorney General of Arizona, issued on September 2, 1978, a new rule designated as R4–14–305. This rule provided in part as follows:

A. In all cases where a domestic insurer has assumed accident and health risks from another company pursuant to a reinsurance agreement:

1. Provision shall be made by the reinsurer on account of such reinsurance for reserves, including without limitation reserves for unearned premiums, equal to all reserves which the ceding insurer would have been required to establish had it retained the risks.

2. The reinsurer shall establish a receivable as an asset of the reinsurer of an amount representing funds withheld by a solvent ceding insurer under a reinsurance agreement or treaty.

Rule R4–14–305 provided that it would become effective prospectively on January 1, 1979. Thus, the rule did not have any retroactive effect, but, rather, was a clarification for the future guidance of Arizona insurance companies that assumed risks under credit disability policies and received premiums on a when-earned basis only. Subsection 3(b) of section 20–505 of the Arizona Revised Statutes granted to the Director of Insurance the authority to require insurance companies to maintain reserves in addition to those expressly required by statute. In view of the prospective effect of Rule R4–14–305, it can hardly be said that Ram acted improperly, and in violation of the Arizona insurance laws, when Ram failed during the 1970–72 period (several years before Rule R4–14–305 was issued) to establish and maintain an unearned premium reserve with respect to the credit disability policies covered by the treaty with Gulf Atlantic.

Insofar as the unearned premium reserve problem is concerned, this case is very similar to *Consumer Life Insurance Co. v. United States*, 207 Ct.Cl. 638, 524 F.2d 1167 (1975), aff'd, 430 U.S. 725, 97 S.Ct. 1440, 52 L.Ed.2d 4 (1977). That case involved, *inter alia*, a reinsurance agreement (referred to as "Treaty I") under which Consumer Life, an insurance company domiciled in Arizona, reinsured 100 percent of the risks in connection with credit life and credit disability policies written by an insurance company domiciled in another State. In accordance with Treaty I, the gross premiums on the credit disability policies were collected by the ceding company; the ceding company at all times retained the unearned portions of the premiums; and as portions of the premiums were earned from month to month, such portions were paid over by the ceding company to the Arizona assuming company. The ceding company established and maintained the unearned premium reserve with respect to the unearned portions of the credit disability premiums, which it retained, and the Arizona assuming company did not maintain an unearned premium reserve. Both companies disclosed in their annual statements the manner in which the unearned premium reserve was being handled; and the insurance departments of the respective States in which they were domiciled did not raise any question concerning the propriety of the companies' actions in this respect.

One of the questions presented for decision in the *Consumer Life* case was whether it was necessary for an Arizona insurance company which received premiums under reinsured credit disability policies on a when-earned basis only to establish and maintain an unearned premium reserve in connection with such policies. Both this court and the Supreme Court answered that question in the negative. In reaching this conclusion, this court stated (207 Ct.Cl. at 652, 524 F.2d at 1175) that "[a]s long as someone has the reserve, this is sufficient"; and the Supreme Court (430 U.S. at 751, 97 S.Ct. at 1454) found "compelling" the cir-

cumstance that "[t]he insurance departments of the affected States consistently accepted annual reports showing reserves held as the taxpayers claim they should be." 430 U.S. at 751, 97 S.Ct. at 1454.[3]

In our case, the insurance departments of Arizona and Texas "consistently accepted annual reports [of Ram and Gulf Atlantic] showing reserves held as the [taxpayer in this case claims] * * * they should be." This circumstance would seem to compel a conclusion in the present case similar to that reached by this court and the Supreme Court in the *Consumer Life* case.

It is my opinion, therefore, that Ram was not required to establish and maintain an unearned premium reserve with respect to the credit disability policies which Ram reinsured for Gulf Atlantic under the treaty that is involved in the present litigation.

### Conclusion

The views expressed in the preceding parts of the opinion necessarily lead to a factual determination that Ram's life insurance reserve (plus any unearned premiums and unpaid losses on non-cancellable life, health, or accident policies not included in life insurance reserves) during the 1970, 1971, and 1972 taxable years comprised more than 50 percent of Ram's total reserves. Accordingly, Ram qualified for income tax treatment as a life insurance company during the 1970–72 period, and is entitled to recover in the present case.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover, together with statutory interest, and judgment is entered to that effect. The amount of plaintiff's recovery will be determined in subsequent proceedings under Rule 131(c).

---

3. Also in connection with unearned premium reserves for credit disability policies, the Government claims that Ariz.Rev.Stat.Ann. § 20–506 (1975), along with several other provisions of Arizona law, requires plaintiff to maintain such a reserve. Similar arguments were raised in *Consumer Life*, and rejected. *See Consumer Life*, 430 U.S. at 751 n.35, 97 S.Ct. at 1454 n.35.